1  505 Harper Dr
2  Algonquin, IL 60102
3  847.873.5335
4

5  April 24, 2024

6                    UNITED STATES DISTRICT COURT
7                    EASTERN DISTRICT OF MICHIGAN
8                         SOUTHERN DIVISION
9

UNITED STATES SECURITIES
AND EXCHANGE
COMMISSION,                        Case:
                                   **2:21-cv-12193-MFL-APP**
Plaintiff,
                                   MOTION FOR RELIEF
        v.                         UNDER RULE 60(B)(1),
                                   FURTHER CLARIFICATION
ROBERT SAMUEL                      and
SHUMAKE, JR., et al.,              AFFIDAVIT OF VICENT
                                   PETRESCU
Defendants.

                                   Hon. Matthew F. Leitman

10

11              MOTION FOR RELIEF UNDER RULE 60(B)(1)
12            OF THE FEDERAL RULES OF CIVIL PROCEDURE
13                                and
14                        FURTHER CLARIFICATION
15

16  Vicent Petrescu, pro se, hereby moves this Court for relief under Rule 60(b)(1)

17  of the Federal Rules of Civil Procedure from the final judgment entered

against him in this case. This motion is based on the grounds of mistaken legal position by the Plaintiff, Securities and Exchange Commission (SEC), and the subsequent correction provided by the Judge Leitman's Order (ECF No. 36) which found that Defendant Shumake did not meet the standard to be a "maker" under *Janus*, directly impacting the foundational basis of the SEC's allegations against TruCrowd and Vicent Petrescu.

## 1. INTRODUCTION

As the founder and CEO of TruCrowd, Inc., and in response to the SEC's legal actions, I assert that the SEC's allegations were predicated on the erroneous SEC legal position that Robert Shumake was a "control person" or "co-managed" issuers Transatlantic Real Estate, LLC, and 420 Real Estate, LLC. This legal stance was central to the SEC's claims leading to the settlements, as detailed in the Exhibit A: "Final Package to Petrescu - Cover Letter-Offer-OIP" and Exhibit B: "Final Package to TruCrowd - Cover Letter-Offer-OIP-Prod Cert."

## 2. DEVASTATING IMPACT ON ABILITY TO SUPPORT FAMILY

The Court's judgment against me (ECF No. 21) has had a crippling effect on my ability to secure employment and support my family financially. Despite

1  my extensive qualifications, including three Master's Degrees, a US CPA

2  license, a Postgraduate Certificate in Business Research and Consulting, and

3  substantial experience as CFO, I have been repeatedly rejected for

4  employment opportunities due to the negative perception created by this

5  judgment.

6  The settlement with the SEC has unjustly tarnished my professional standing,

7  despite my extensive qualifications and experience. A simple Google search

8  now overshadows my accomplishments with unfavorable results, painting an

9  inaccurate and highly damaging portrayal of my character and capabilities.

10

11  3.  CONTRADICTIONS  BETWEEN  JUDGMENTS  AND  COURT'S

12  RULING

13  The judgments entered against me and TruCrowd (ECF No. 21 and ECF No.

14  22) were predicated on allegations that Shumake was a "maker," "control

15  person," or "co-managed" the two offerings in question. However, the Judge

16  Leitman's findings (ECF No. 36) directly contradict these allegations,

17  establishing that Shumake did not meet the requisite standard to be considered

18  a "maker" under the Janus case.

19  This discrepancy renders the foundational premise upon which the judgments

20  were based invalid and untenable. The judgments were grounded on assertions

that have been explicitly refuted by the Court's ruling, creating an irreconcilable contradiction between the judgments and the Court's legal conclusions.

As such, the judgments (ECF No. 21 and ECF No. 22) are now inconsistent with and unsupported by the Court's own findings, necessitating a re-evaluation and potential vacatur to align with the established facts and legal interpretations set forth in the Court's ruling (ECF No. 36).

## 4. MISTAKE ON THE POSITION TAKEN BY THE SEC

The SEC introduced the term "co-managed," not recognized within Regulation Crowdfunding or other related SEC crowdfunding regulations, to assert that Shumake "co-managed" the offerings. This term's introduction and application constitute a mistake by the SEC, aimed at supporting their allegations against TruCrowd and myself.

## 5. HONORABLE JUDGE LEITMAN'S ORDER

Judge Leitman's ruling in this case (ECF No. 36) dismissed the SEC's claim that Shumake violated Securities and Exchange Commission (SEC) Rule 10b-5(b), 17 CFR § 240.10b-5(b). as he did not meet the "maker" requirement under *Janus*. This ruling directly contradicts the foundational basis of the

SEC's position against TruCrowd and myself.

6. TIMELINESS OF THE MOTION

Under Rule 60(d)(1), the request for relief should be made timely. This motion is timely as the Order that confirms my position was entered on June 9, 2023. The clarification provided by this Order necessitates reconsideration of the judgment entered against me (ECF 21).

PRAYER FOR RELIEF

In light of the Judge Leitman's Order (ECF No. 36) finding that Defendant Shumake did not meet the "maker" standard under Janus, which contradicts the SEC's mistaken position underlying the judgments, I respectfully request that this Court:

a.) Vacate and void the judgments and related settlements from ECF No. 21 and ECF No. 22, either pursuant to Rule 60(b)(1) of the Federal Rules of Civil Procedure due to "mistake, inadvertence, surprise, or excusable neglect," or *sua sponte*.

b.) Further clarification by explicitly stating  that the Judge Leitman's findings in ECF No. 36, establishing Shumake did not meet the *Janus* standard, correlate to a lack of culpability on my part.

1    By granting this relief, the Court can rectify the injustice resulting from the

2    SEC's mistaken allegations and uphold the principles of justice and fairness,

3    given the new evidence and legal interpretations that have come to light.

4

5    Respectfully submitted,

6

7    /s/ Vicent Petrescu, Pro Se

8    April 24, 2024

9

10    505 Harper Dr, Algonquin, IL 60102

11    847.873.5335

12    vincent.petrescu@gmail.com

13

14

15

16

17

18

19

20

21

1  AFFIDAVIT OF VICENT PETRESCU

2  STATE OF ILLINOIS

3  COUNTY OF McHENRY

4

5  I, Vicent Petrescu, under oath, hereby affirm and state the following:

6

7  1. INTRODUCTION

8  As the founder and CEO of TruCrowd, Inc., a funding portal registered with

9  the SEC, I submit this affidavit in response to the SEC's legal actions against

10  myself and TruCrowd, specifically the Judgements in the case SEC vs.

11  Shumake (ECF No. 21 and ECF No. 22), and pursuant to the Court's Order

12  (ECF No. 36) which found Defendant Shumake not to be a "maker" as defined

13  in *Janus*.

14

15  2. ALLEGATIONS AND COMPLIANCE

16  The SEC's allegations against TruCrowd and myself were predicated on the

17  belief that Robert Shumake was a "control person" or "co-managed" issuers

18  Transatlantic Real Estate, LLC, and 420 Real Estate, LLC. This assumption

19  was the cornerstone of the SEC's claims and led to two settlements, as detailed

1   in the documents "Final Package to Petrescu - Cover Letter-Offer-OIP" and

2   "Final Package to TruCrowd - Cover Letter-Offer-OIP-Prod Cert."

3

4   3. SEC'S ERRONEOUS POSITION ON SHUMAKE'S ROLE

5   The SEC contended that Shumake's role in the crowdfunding offerings was

6   akin to that of "the issuer's officers and directors (and any persons performing

7   similar functions)," as outlined in Exhibit C. Despite our consistent rebuttals

8   that Shumake did not fulfill the criteria of a "control person" or an "associated

9   person" under SEC and Regulation Crowdfunding guidelines, the SEC

10  persisted with its stance.

11

12  4. INTRODUCTION OF "CO-MANAGED" TERM

13  Subsequent to our initial responses, the SEC introduced the term

14  "co-managed," which is not recognized within Regulation Crowdfunding or

15  other related SEC regulations. This term was used to assert that Shumake

16  "co-managed" the offerings with Birch, as stated in Exhibits A and B.

17

18  5. SEC'S MISTAKE

19  The SEC's use of "co-managed" appears to be an attempt to categorize

20  Shumake within a framework not defined by existing SEC rules, suggesting

1  an implicit acknowledgment that he could not be classified under the

2  established definitions. I contend that this represents a mistake by the SEC,

3  aimed at bolstering their allegations against TruCrowd and myself.

4

5  6. CONCLUSION

6  The settlements were predicated on the SEC's assertion that Shumake was a

7  "control person of" or "co-managed" the offerings. However, the Judge

8  Leitman's ruling dismissed the SEC's claim that Shumake violated Rule

9  10b-5(b), as he did not meet the "maker" requirement under *Janus* (ECF No.

10  36, ECF No. 38), thereby invalidating the foundation of the SEC's position.

11

12  EXHIBITS REFERENCED

13  **Exhibit A:** "Final Package to Petrescu - Cover Letter-Offer-OIP"

14  document, detailing the SEC's allegations and proposed settlement

15  terms concerning my involvement and TruCrowd's compliance efforts.

16  **Exhibit B:** "Final Package to TruCrowd - Cover Letter-Offer-OIP-Prod

17  Cert" document, outlining the SEC's allegations and proposed

18  settlement terms concerning TruCrowd's involvement and compliance

19  efforts.

**Exhibit C:** "SEC Compliant _ Confidential Attorney Client Communication and Work Product _ Claims 9 26 21" document, providing detailed responses to the SEC's allegations and clarifying the roles and responsibilities of the parties involved in the crowdfunding offerings.

I hereby affirm, under penalty of perjury, that the statements herein are accurate and truthful to the best of my knowledge, information, and belief.

_____

/s/ Vicent Petrescu, Pro Se

April 24, 2024

505 Harper Dr, Algonquin, IL 60102

847.873.5335

vincent.petrescu@gmail.com

1    CERTIFICATE OF SERVICE

2

3    I hereby certify that on April 22, 2024 a true and correct copy of the foregoing

4    MOTION    FOR    RELIEF    UNDER    RULE    60(B)(1),    FURTHER

5    CLARIFICATION and AFFIDAVIT OF VICENT PETRESCU were sent  to

6    the Plaintiff, Securities and Exchange Commission, via email.

7

8    /s/ Vicent Petrescu, Pro Se

9    April 24, 2024

10

11    505 Harper Dr, Algonquin, IL 60102

12    847.873.5335

13    vincent.petrescu@gmail.com

14

15

16

17

18

19

# Exhibit A:

Final Package to Petrescu - Cover Letter-Offer-OIP



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
175 W. JACKSON BOULEVARD, SUITE 1450
CHICAGO, IL 60604

CHICAGO
REGIONAL OFFICE

*For Settlement Purposes Only*

August 12, 2021

**VIA SECURE EMAIL**
Mr. Vincent Petrescu
505 Harper Dr.
Algonquin, IL 60102.

    Re:  *In the Matter of Bangi Investments, LLC* (C-08660)

Dear Mr. Petrescu:

    Enclosed is a copy of the proposed settled Order ("Order") and corresponding Offer of Settlement ("Offer"). The Order reflects the factual findings that the staff currently is willing to recommend to the Commission to resolve this matter as to Vincent Petrescu.

    Enclosed are a number of documents associated with the proposed offer of settlement. First, enclosed is a copy of the proposed Order, which the Division is prepared to recommend that the Commission institute on a settled basis. Next, I have enclosed a copy of a proposed Offer of Settlement as to Vincent Petrescu. These documents are furnished to you for purposes of settlement only. Please note that, as part of its standard practice of reviewing offers of settlement, the Commission staff may require additional edits to the enclosed documents. If there are any such changes, we will let you know so you may determine if you are willing to make an offer of settlement that includes such changes. Further, please understand that, notwithstanding any recommendation made by the staff, the Commission may determine to reject, or accept conditioned upon changes to, the terms of any offer of settlement, including the one reflected in the enclosed documents. If no agreement is reached on this matter, the staff reserves the right to file pleadings that differ from the ones enclosed.

    If you agree to settle this matter according to the terms set forth in the Offer of Settlement, please provide me with an electronic pdf and two original, fully executed Offers of Settlement by **August 16, 2021 at 5:00 p.m. ET.**

I look forward to hearing back from you as soon as possible.  Thank you.

Sincerely,

Jerrold H. Kohn
Senior Counsel
Division of Enforcement

Enclosures:
 Offer of Settlement of Vincent Petrescu
 Order Instituting Proceedings

# UNITED STATES OF AMERICA
## before the
## SECURITIES AND EXCHANGE COMMISSION

**ADMINISTRATIVE PROCEEDING**
**File No.**

| | |
|---|---|
| **In the Matter of**<br><br>**TRUCROWD, INC., DBA**<br>**FUNDANNA, and**<br>**VINCENT PETRESCU**<br><br>**Respondents.** | **OFFER OF SETTLEMENT OF**<br>**VINCENT PETRESCU** |

## I.

Vincent Petrescu ("Petrescu" or "Respondent"), pursuant to Rule 240(a) of the Rules of Practice of the Securities and Exchange Commission ("Commission") [17 C.F.R. § 201.240(a)] submits this Offer of Settlement ("Offer") in anticipation of public administrative and cease-and-desist proceedings to be instituted against him by the Commission, pursuant to Section 8A of the Securities Act of 1933 ("Securities Act"), Sections 4C,[1] 15(b), and 21C of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 102(e)(1)(iii) of the Commission's Rules of Practice.[2]

---

[1]      Section 4C provides, in relevant part, that:

> The Commission may censure any person, or deny, temporarily or permanently, to any person the privilege of appearing or practicing before the Commission in any way, if that person is found . . . (1) not to possess the requisite qualifications to represent others; (2) to be lacking in character or integrity, or to have engaged in unethical or improper professional conduct; or (3) to have willfully violated, or willfully aided and abetted the violation of, any provision of the securities laws or the rules and regulations issued thereunder.

[2]      Rule 102(e)(1)(iii) provides, in pertinent part, that:

> The Commission may . . . deny, temporarily or permanently, the privilege of appearing or practicing before it . . . to any person who is found…to have willfully violated, or willfully aided and abetted the violation of any provision of the Federal securities laws or the rules and regulations thereunder.

## II.

This Offer is submitted solely for the purpose of settling these proceedings, with the express understanding that it will not be used in any way in these or any other proceedings, unless the Offer is accepted by the Commission.  If the Offer is not accepted by the Commission, the Offer is withdrawn without prejudice to Respondent and shall not become a part of the record in these or any other proceedings, except that rejection of the Offer does not affect the continued validity of the waivers pursuant to Rule 240(c)(5) of the Commission's Rules of Practice [17 C.F.R. § 201.240(c)(5)] with respect to any discussions concerning the rejection of the Offer.

## III.

Consistent with the provisions of 17 C.F.R. § 202.5(f), Respondent waives any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein.

## IV.

Respondent hereby waives any rights under the Equal Access to Justice Act, the Small Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to seek from the United States, or any agency, or any official of the United States acting in his or her official capacity, directly or indirectly, reimbursement of attorney's fees or other fees, expenses, or costs expended by Respondent to defend against this action.  For these purposes, Respondent agrees that Respondent is not the prevailing party in this action since the parties have reached a good faith settlement.

## V.

By submitting this Offer, Respondent hereby waives, subject to the acceptance of the offer, the rights specified in Rule 240(c)(4) [17 C.F.R. §201.240(c)(4)] of the Commission's Rules of Practice.  Specifically, Respondent waives:

> (1) All hearings pursuant to the statutory provisions under which the proceeding is to be or has been instituted;
> (2) The filing of proposed findings of fact and conclusions of law;
> (3) Proceedings before, and an initial decision by, a hearing officer;
> (4) All post-hearing procedures; and
> (5) Judicial Review by any court.

In addition, by submitting this offer, Respondent waives the rights specified in Rule 240(c)(5) [17 C.F.R. § 201.240(c)(5)] of the Commission's Rules of Practice. Specifically, Respondent waives:

> (1) Any and all provisions of the Commission's Rules of Practice or other requirements of law that may be construed to prevent or disqualify any member of the Commission's staff from participating in the preparation of, or advising

- 2 -

the Commission as to, any order, opinion, finding of fact, or conclusion of law that may be entered pursuant to this Offer; and

(2) Any right to claim bias or prejudgment by the Commission based on the consideration of or discussions concerning settlement of all or any part of this proceeding.

Respondent also hereby waives service of the Order.

## VI.

Respondent hereby:

A.     Admits the jurisdiction of the Commission over him and over the matters set forth in the Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, Sections 4C, 15(b), and 21C of the Securities Exchange Act of 1934, and Rule 102(e) of the Commission's Rules of Practice, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), which is attached;

B.     Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission or in which the Commission is a party, and without admitting or denying the findings contained in the Order, except as to the Commission's jurisdiction over him and the subject matter of these proceedings, which are admitted, and except as provided herein in Section X, consents to the entry of the Order, in which the Commission:

1.     Finds that Petrescu willfully violated Section 4A(a)(5) of the Securities Act and Rule 301(c)(2) thereunder.

2.     Orders Petrescu to cease and desist from committing or causing any violations and any future violations of Section 4A(a)(5) of the Securities Act and Rule 301(c)(2) thereunder.

3.     Orders that Petrescu is denied from appearing or practicing before the Commission as an accountant.

4.     After three years from the date of this order, Petrescu may request that the Commission consider his reinstatement by submitting an application (attention: Office of the Chief Accountant) to resume appearing or practicing before the Commission as:

(a)     a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission (other than as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Securities Exchange Act of 1934.  Such an application must satisfy the Commission that Petrescu's work in his practice before the Commission as an accountant will be reviewed either by the independent audit committee of the public company for which he works or in

- 3 -

some other acceptable manner, as long as he practices before the Commission in this capacity; and/or

      (b)    a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Securities Exchange Act of 1934.  Such an application will be considered on a facts and circumstances basis with respect to such membership, and the applicant's burden of demonstrating good cause for reinstatement will be particularly high given the role of the audit committee in financial and accounting matters; and/or

      (c)    an independent accountant.

Such an application must satisfy the Commission that

      (i) Petrescu, or the public accounting firm with which he is associated, is registered with the Public Company Accounting Oversight Board ("Board") in accordance with the Sarbanes-Oxley Act of 2002, and such registration continues to be effective;

      (ii) Petrescu, or the registered public accounting firm with which he is associated, has been inspected by the Board and that inspection did not identify any criticisms of or potential defects in the respondent's or the firm's quality control system that would indicate that Petrescu will not receive appropriate supervision;

      (iii) Petrescu has resolved all disciplinary issues with the Board, and has complied with all terms and conditions of any sanctions imposed by the Board (other than reinstatement by the Commission); and

      (iv) Petrescu acknowledges his responsibility, as long as he appears or practices before the Commission as an independent accountant, to comply with all requirements of the Commission and the Board, including, but not limited to, all requirements relating to registration, inspections, concurring partner reviews and quality control standards.

      5.    The Commission will consider an application by Petrescu to resume appearing or practicing before the Commission provided that his state CPA license is current and he has resolved all other disciplinary issues with the applicable state boards of accountancy.  However, if state licensure is dependent on reinstatement by the Commission, the Commission will consider an application on its other merits.  The Commission's review may include consideration of, in addition to the matters referenced above, any other matters relating to Petrescu's character, integrity, professional conduct, or qualifications to appear or practice before the Commission as an accountant.  Whether an application demonstrates good cause will be considered on a facts and circumstances basis with due regard for protecting the integrity of the Commission's processes.

6.      Orders that Petrescu shall, within 10 days of the entry of this Order, pay a civil money penalty in the amount of $9,700 to the Securities and Exchange Commission. The Commission may distribute civil money penalties collected in this proceeding if, in its discretion, the Commission orders the establishment of a Fair Fund  pursuant to 15 U.S.C. § 7246, Section 308(a) of the Sarbanes-Oxley Act of 2002, as amended. The Commission will hold funds paid pursuant to this paragraph in an account at the United States Treasury pending a decision whether the Commission, in its discretion, will seek to distribute funds or, subject to Exchange Act Section 21F(g)(3), transfer them to the general fund of the United States Treasury.  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

Payment must be made in one of the following ways:

(1)      Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)      Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)      Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Petrescu as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Paul A. Montoya, Associate Regional Director Chicago Regional Office, Securities and Exchange Commission, 175 W. Jackson Blvd., Suite 1450, Chicago, IL 60604.

7.      Regardless of whether the Commission in its discretion orders the creation of a Fair Fund for the penalties ordered in this proceeding, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, he shall not argue that he is entitled to, nor shall he benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that he shall, within 30 days after entry

of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

## VII.

Respondent understands and agrees to comply with the terms of 17 C.F.R § 202.5(e), which provides in part that it is the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceedings," and "a refusal to admit the allegations is equivalent to a denial, unless the defendant or respondent states that he neither admits nor denies the allegations." As part of Respondent's agreement to comply with the terms of Section 202.5(e), Respondent: (i) will not take any action or make or permit to be made any public statement denying, directly or indirectly, any finding in the Order or creating the impression that the Order is without factual basis; (ii) will not make or permit to be made any public statement to the effect that Respondent does not admit the findings of the Order, or that the Offer contains no admission of the findings, without also stating that the Respondent does not deny the findings; and (iii) upon the filing of this Offer of Settlement, Respondent hereby withdraws any papers previously filed in this proceeding to the extent that they deny, directly or indirectly, any finding in the Order. If Respondent breaches this agreement, the Division of Enforcement may petition the Commission to vacate the Order and restore this proceeding to its active docket. Nothing in this provision affects Respondent's: (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party.

## VIII.

Respondent understands that by settling to denial of the privilege of appearing or practicing before the Commission with a right to apply for reinstatement, Respondent will be able to make an application for reinstatement after the specified time period. This application, however, does not guarantee reinstatement. Rather, Respondent's application will be subject to the reinstatement process set forth in the Order and the applicable rules and regulations governing the reinstatement process, and Respondent's reinstatement will be subject to the discretion of the Commission.

## IX.

Respondent agrees that he shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source including, but not limited to, payment made pursuant to any insurance policy, with regard to any penalty amounts that Respondent shall pay pursuant to this Order, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors. Respondent further agrees that he shall not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state or local tax for any penalty amounts that Respondent shall pay pursuant to this Order, regardless of

whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors.

## X.

Respondent stipulates solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S. C. §523, that the findings in the Order are true and admitted by Respondent, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Respondent under the Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Respondent of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

## XI.

Respondent states that he has read and understands the foregoing Offer, that this Offer is made voluntarily, and that no promises, offers, threats, or inducements of any kind or nature whatsoever have been made by the Commission or any member, officer, employee, agent, or representative of the Commission in consideration of this Offer or otherwise to induce him to submit to this Offer.

_____ Day of _____          _____
                                        Vincent Petrescu

**STATE OF ILLINOIS**          }
                               }      **SS:**
**COUNTY OF _____** }

The foregoing instrument was acknowledged before me this __day of _____, 2021, by VINCENT PETRESCU, who ___is personally known to me or ___who has produced an Illinois driver's license as identification and who did take an oath.


_____
Notary Public
State of Illinois
Commission Number        :
Commission Expiration    :

- 7 -

# UNITED STATES OF AMERICA
## Before the
## SECURITIES AND EXCHANGE COMMISSION

**SECURITES ACT OF 1933**
**Release No.**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No.**

**ACCOUNTING AND AUDITING ENFORCEMENT**
**Release No.**

**ADMINISTRATIVE PROCEEDING**
**File No.**

| | |
|---|---|
| **In the Matter of**<br><br>   **TRUCROWD, INC., DBA FUNDANNA, and VINCENT PETRESCU**<br><br>**Respondents.** | **ORDER INSTITUTING PUBLIC ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933, SECTIONS 4C, 15(b), AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934, AND RULE 102(e) OF THE COMMISSION'S RULES OF PRACTICE, MAKING  FINDINGS, AND IMPOSING REMEDIAL  SANCTIONS AND A CEASE-AND-DESIST ORDER** |

## I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Sections 15(b) and 21C of the Securities Exchange Act of 1934 ("Exchange Act") against TruCrowd, Inc., DBA Fundanna ("TruCrowd") and Vincent Petrescu ("Petrescu") (collectively, "Respondents"), and that public administrative and cease-and-desist proceedings be, and hereby

are, instituted against Petrescu pursuant to Sections 4C[1] and 21C of the Exchange Act and Rule 102(e)(1)(iii) of the Commission's Rules of Practice.[2]

## II.

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement (the "Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, and except as provided herein in Section V, Respondents consent to the entry of this Order Instituting Public Administrative and Cease-and-Desist Proceedings Pursuant to Sections 8A of the Securities Act of 1933, Sections 4C, 15(b), and 21C of the Securities Exchange Act of 1934, and Rule 102(e) of Commission's Rules of Practice, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

## III.

On the basis of this Order and Respondents' Offers, the Commission finds[3] that:

### Summary

1.     This matter concerns fraudulent crowdfunding offerings hosted by TruCrowd, an SEC registered funding portal founded by Petrescu, who is the firm's chief executive officer. The crowdfunding offering frauds were perpetrated by Robert Shumake ("Shumake") alongside associates, Nicole T. Birch ("Birch") and Willard L. Jackson ("Jackson"), through two companies, Transatlantic Real Estate, LLC ("Transatlantic Real Estate") and 420 Real Estate,

---

[1]     Section 4C provides, in relevant part, that:

The Commission may censure any person, or deny, temporarily or permanently, to any person the privilege of appearing or practicing before the Commission in any way, if that person is found . . . (1) not to possess the requisite qualifications to represent others; (2) to be lacking in character or integrity, or to have engaged in unethical or improper professional conduct; or (3) to have willfully violated, or willfully aided and abetted the violation of, any provision of the securities laws or the rules and regulations issued thereunder.

[2]     Rule 102(e)(1)(iii) provides, in pertinent part, that:

The Commission may . . . deny, temporarily or permanently, the privilege of appearing or practicing before it . . . to any person who is found…to have willfully violated, or willfully aided and abetted the violation of any provision of the Federal securities laws or the rules and regulations thereunder.

[3]     The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

LLC ("420 Real Estate") (collectively, "Crowdfunding Offerings"). Shumake, who had a criminal history, concealed from the public his involvement with the Crowdfunding Offerings with the assistance of Birch and Jackson.

2.      Through TruCrowd's platform, Transatlantic Real Estate and 420 Real Estate raised $1,020,100 between September 2018 and May 2019 and $888,180 between May 2019 and June 2020, respectively. The Form Cs that Transatlantic Real Estate and 420 Real Estate filed in connection with their respective Crowdfunding Offerings represented that the intended use of the offering proceeds was to acquire or improve real estate for use in the cannabis and hemp industries. However, neither Transatlantic Real Estate nor 420 Real Estate spent any of the funds raised on real estate. Instead, Shumake, Birch, and Jackson diverted investor funds for their personal use and for purposes unrelated to the Crowdfunding Offerings.

3.      TruCrowd and Petrescu were gatekeepers. As a funding portal and its officer, TruCrowd and Petrescu were responsible for, among other things, taking measures to reduce the risk of fraud in connection with the Crowdfunding Offerings. Petrescu granted Shumake, Birch, and Jackson access to TruCrowd's platform. Petrescu disregarded certain red flags during the Transatlantic Real Estate offering regarding Shumake's criminal history and role with the company. These red flags indicated potential fraud or otherwise raised investor protection concerns. Nonetheless, Petrescu allowed the Transatlantic Real Estate offering to continue and close. Subsequently, Petrescu permitted Shumake and Jackson to use TruCrowd's platform for the 420 Real Estate offering. Notwithstanding these red flags, in addition to investor complaints regarding the Crowdfunding Offerings, Petrescu allowed the 420 Real Estate offering to remain on TruCrowd's platform until it closed.

4.      Under these facts and circumstances, TruCrowd and Petrescu willfully violated Section 4A(a)(5) of the Securities Act and Rule 301(c)(2) thereunder.

## Respondents

5.      **TruCrowd Inc., DBA Fundanna**, is a Delaware corporation with its principal place of business in Schaumburg, Illinois. TruCrowd has been registered with the SEC and FINRA as a funding portal since February 2016.

6.      **Vincent Petrescu,** age 49, resides in Algonquin, Illinois. Petrescu is the founder, CEO, and majority owner of TruCrowd. Petrescu was a certified public accountant in the state of Illinois and Indiana during the relevant period. Petrescu's Indiana CPA license expired on June 30, 2021.

## Relevant Entities and Individual

7.      **Transatlantic Real Estate, LLC** was a California limited liability company formed in August 2018 with its principal place of business in Grosse Pointe Farms, Michigan. Transatlantic Real Estate purported to acquire and lease properties in the cannabis industry. Birch was its CEO. Transatlantic Real Estate filed a Form C with the Commission and conducted a crowdfunding offering between September 2018 and May 2019. Transatlantic Real Estate was dissolved in July 2021.

8.      **420 Real Estate, LLC** is a Texas limited liability company formed in April 2019 with its principal place of business in Houston, Texas. 420 Real Estate purports to acquire and lease properties in the hemp industry. Jackson is its CEO. 420 Real Estate filed a Form C with the Commission and conducted a crowdfunding offering between May 2019 and June 2020.

9.      **Robert Shumake**, age 53, resides in Bloomfield Hills, Michigan. In December 2017, in connection with a home mortgage scheme, Shumake pled guilty in the state of Michigan to two misdemeanor counts of violating Michigan's Credit Services Protection Act, and on behalf of his business, to two felony counts of obtaining money by false pretense. The judge sentenced him to probation, which terminated in May 2019. The sentencing order prohibited Shumake from working in a position where he had direct control over, or access to, another person's money during the probationary period.

### The Crowdfunding Offerings

10.      Petrescu, as TruCrowd's CEO, is responsible for selecting which issuers and associated persons may use TruCrowd's funding portal for crowdfunding offerings. Petrescu also assists issuers with preparing and filing the Form C crowdfunding offering statements.

11.      In August 2018, TruCrowd, after Petrescu spoke with Shumake and Birch, hosted Transatlantic Real Estate's crowdfunding offering on TruCrowd's platform.

12.      Transatlantic Real Estate's offering statement omitted Shumake's involvement, named Birch as the sole officer, and represented that Transatlantic Real Estate was a real estate company in the cannabis industry.

13.      Between September 2018 and May 2019, Transatlantic Real Estate raised $1,020,100 from multiple investors residing in different states. Each investor received a convertible note purportedly earning 15% interest annually in exchange for their investment.

14.      In 2019, TruCrowd, after Petrescu spoke with Shumake and Jackson, hosted 420 Real Estate's crowdfunding offering on TruCrowd's platform.

15.      Nearly identical to Transatlantic Real Estate's offering statement, 420 Real Estate's offering statement omitted Shumake's involvement, named Jackson as the sole officer, and represented that 420 Real Estate was a real estate company that acquired and leased properties in the hemp industry.

16.      Between May 2019 and June 2020, 420 Real Estate raised $888,180 from multiple investors residing in different states. In exchange for their investment, each investor received a convertible note purportedly earning 10% interest annually.

### Petrescu Ignored Red Flags

17.      Petrescu disregarded red flags concerning Shumake and his role with the Crowdfunding Offerings; the red flags indicated potential fraud or otherwise raised investor protection concerns. These red flags appeared during the Transatlantic Real Estate offering and

continued throughout the subsequent 420 Real Estate offering. Petrescu failed to follow up on the red flags to reduce the risk of fraud.

18.     Although Transatlantic Real Estate's offering statement did not disclose Shumake's involvement, Shumake co-managed Transatlantic Real Estate with Birch. Likewise, Birch told Petrescu that she was the sole officer and that Shumake only provided marketing services. However, Shumake routinely coordinated with Petrescu to address non-marketing matters. For example:

   a.  Petrescu copied Shumake on material discussions regarding the drafting and filing of Transatlantic Real Estate's offering statement.

   b.  Petrescu took direction from Shumake concerning communications with existing and prospective investors.

   c.  Petrescu referred Shumake to a transfer agent which Shumake engaged on behalf of Transatlantic Real Estate.

   d.  Petrescu considered Shumake a Transatlantic Real Estate representative and, therefore, granted Shumake access to information pertaining to the Transatlantic Real Estate offering and its investors on TruCrowd's internal platform.

19.     Despite Shumake's involvement with the Transatlantic Real Estate offering, Petrescu never questioned why the offering statement did not identify Shumake.

20.     During the Transatlantic Real Estate offering, Petrescu disregarded red flags regarding Shumake, which indicated potential fraud or otherwise raised investor protection concerns. In November 2018, two months after the Transatlantic Real Estate offering opened, Petrescu received an email from Birch, which she forwarded from an individual who had performed services for Transatlantic Real Estate. This individual notified Birch and Shumake that he had referred the Transatlantic Real Estate account for collections and warned them of the potential impact of "SEC, Bad Actor Check," if they did not resolve this matter. Yet, Petrescu did not question Birch or Shumake regarding this email or take any steps to investigate the issues raised in this email.

21.     In December 2018, an experienced securities attorney emailed Petrescu information concerning Shumake's criminal past, which raised investor protection concerns. Per Petrescu's referral, this attorney met with Birch and Shumake to explore a potential securities offering for another entity. The attorney informed Petrescu that he declined to work with Birch and Shumake because their lack of industry experience constituted a "red flag" for him.

22.     In the same email, the attorney included a link to an April 2017 news report about Shumake's criminal case. The news article discussed the criminal case against Shumake brought by the Michigan Attorney General alleging that Shumake was behind a scheme to cheat people who were trying to save their homes from foreclosure. Petrescu replied, "That does not look good" and said he would "search more." Yet, Petrescu did not follow up on this red flag by, for example, investigating Shumake's past or role with Transatlantic Real Estate.

23.     Petrescu permitted the Transatlantic Real Estate offering to proceed on TruCrowd's platform until it closed in May 2019.

24.     After the Transatlantic Real Estate offering closed, Petrescu agreed to work with Shumake again in May 2019 and host the subsequent 420 Real Estate offering on TruCrowd's platform. In addition to the above-mentioned red flags, Petrescu continued to ignore red flags throughout the 420 Real Estate Offering. For example:

   a.   Like the Transatlantic Real Estate offering, Shumake co-managed the 420 Real Estate offering. The 420 Real Estate offering statement, however, was nearly identical to the Transatlantic Real Estate offering statement and omitted Shumake's involvement.

   b.   In mid-2020 and before the 420 Real Estate offering closed, both Birch and Jackson separately informed Petrescu that Shumake acted improperly. They instructed Petrescu to stop taking directions from Shumake and to deny Shumake access to information relating to the Crowdfunding Offerings.

   c.   Around the same time and prior to the closing of the 420 Real Estate offering, Petrescu, through TruCrowd's platform, received investor complaints and concerns regarding both Transatlantic Real Estate and 420 Real Estate's inadequate management and poor communications concerning the Crowdfunding Offerings. Some investors questioned the legitimacy of the Crowdfunding Offerings.

25.     Notwithstanding the red flags raised in the Transatlantic Real Estate offering and the red flags that persisted in the 420 Real Estate offering, Petrescu did not investigate Shumake's role with the 420 Real Estate offering or take any steps to research Shumake's past.

26.     Petrescu allowed the 420 Real Estate offering to continue on TruCrowd's platform until it closed in June 2020.

**Shumake, Birch, and Jackson Diverted Investor
Funds for Personal Use and other Improper Purposes**

27.     TruCrowd and Petrescu's failure to follow up on the red flags to reduce the risk of fraud enabled Shumake, Birch, and Jackson to divert investor funds for their own use and other improper purposes.

28.     Contrary to the disclosures in the Transatlantic Real Estate offering statement, Shumake and Birch diverted hundreds of thousands of dollars in investment proceeds to themselves and for improper purposes. Transatlantic Real Estate did not use any investment proceeds to purchase or improve property. Transatlantic Real Estate investors have not received any monetary return on their investment.

29.     Contrary to the disclosures in the 420 Real Estate offering statement, Shumake and Jackson diverted hundreds of thousands of dollars in investment proceeds to themselves and for improper purposes. 420 Real Estate did not use any investment proceeds to purchase or

improve property. 420 Real Estate investors have not received any monetary return on their investment.

## Violations

30.    As a result of the conduct described above, Respondents TruCrowd and Petrescu willfully violated Section 4A(a)(5) of the Securities Act and Rule 301(c)(2) thereunder.

## Disgorgement and Civil Penalties

31.    The disgorgement and prejudgment interest ordered in paragraph IV.F is consistent with equitable principles and does not exceed Respondent TruCrowd's net profits from its violations and will be distributed to harmed investors, if feasible. The Commission will hold funds paid pursuant to paragraphs IV.F and IV.G in an account at the United States Treasury pending a decision whether the Commission in its discretion will seek to distribute funds. If a distribution is determined feasible and the Commission makes a distribution, upon approval of the distribution final accounting by the Commission, any amounts remaining that are infeasible to return to investors, and any amounts returned to the Commission in the future that are infeasible to return to investors, may be transferred to the general fund of the U.S. Treasury, subject to Section 21F(g)(3) of the Exchange Act.

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondents' Offers.

Accordingly, it is hereby ORDERED, effective immediately, that:

A.    Respondents TruCrowd and Petrescu shall cease and desist from committing or causing any violations and any future violations of Section 4A(a)(5) of the Securities Act and Rule 301(c)(2) thereunder.

B.    Respondent TruCrowd is censured.

C.    Respondent Petrescu is denied from appearing or practicing before the Commission as an accountant.

D.    After three years from the date of this order, Petrescu may request that the Commission consider his reinstatement by submitting an application (attention: Office of the Chief Accountant) to resume appearing or practicing before the Commission as:

> 1.    a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission (other than as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Securities Exchange Act of 1934). Such an application must satisfy the Commission that Petrescu's work in his practice before the Commission as an accountant will be reviewed either by the

independent audit committee of the public company for which he works or in some other acceptable manner, as long as he practices before the Commission in this capacity; and/or

2.      a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Securities Exchange Act of 1934. Such an application will be considered on a facts and circumstances basis with respect to such membership, and the applicant's burden of demonstrating good cause for reinstatement will be particularly high given the role of the audit committee in financial and accounting matters; and/or

3.      an independent accountant.

Such an application must satisfy the Commission that:

(a)      Petrescu, or the public accounting firm with which he is associated, is registered with the Public Company Accounting Oversight Board ("Board") in accordance with the Sarbanes-Oxley Act of 2002, and such registration continues to be effective;

(b)      Petrescu, or the registered public accounting firm with which he is associated, has been inspected by the Board and that inspection did not identify any criticisms of or potential defects in the respondent's or the firm's quality control system that would indicate that Petrescu will not receive appropriate supervision;

(c)      Petrescu has resolved all disciplinary issues with the Board, and has complied with all terms and conditions of any sanctions imposed by the Board (other than reinstatement by the Commission); and

(d)      Petrescu acknowledges his responsibility, as long as he appears or practices before the Commission as an independent accountant, to comply with all requirements of the Commission and the Board, including, but not limited to, all requirements relating to registration, inspections, concurring partner reviews and quality control standards.

E.      The Commission will consider an application by Petrescu to resume appearing or practicing before the Commission provided that his state CPA license is current and he has resolved all other disciplinary issues with the applicable state boards of accountancy. However, if state licensure is dependent on reinstatement by the Commission, the Commission will consider an application on its other merits. The Commission's review may include consideration of, in addition to the matters referenced above, any other matters relating to Petrescu's character, integrity, professional conduct, or qualifications to appear or practice before the Commission as

an accountant. Whether an application demonstrates good cause will be considered on a facts and circumstances basis with due regard for protecting the integrity of the Commission's processes.

        F.      Respondent TruCrowd shall, within 10 days of the entry of this Order, pay disgorgement of $129,380 and prejudgment interest of $16,738 to the Securities and Exchange Commission. The Commission will hold funds paid pursuant to this paragraph in an account at the United States Treasury pending a decision whether the Commission, in its discretion, will seek to distribute funds or, transfer them to the general fund of the United States Treasury, subject to Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600.

        G.      Respondents TruCrowd and Petrescu shall, within 10 days of the entry of this Order, pay civil money penalties in the amounts of $97,500 and $9,700, respectively, to the Securities and Exchange Commission. The Commission may distribute civil money penalties collected in this proceeding if, in its discretion, the Commission orders the establishment of a Fair Fund pursuant to 15 U.S.C. § 7246, Section 308(a) of the Sarbanes-Oxley Act of 2002. The Commission will hold funds paid pursuant to this paragraph in an account at the United States Treasury pending a decision whether the Commission, in its discretion, will seek to distribute funds or, subject to Exchange Act Section 21F(g)(3), transfer them to the general fund of the United States Treasury. If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

Payment must be made in one of the following ways:

        (1)      Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

        (2)      Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

        (3)      Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

        Enterprise Services Center
        Accounts Receivable Branch
        HQ Bldg., Room 181, AMZ-341
        6500 South MacArthur Boulevard
        Oklahoma City, OK 73169

        Payments by check or money order must be accompanied by a cover letter identifying TruCrowd and/or Petrescu as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Paul A. Montoya, Chicago Regional Office, Securities and Exchange Commission, 175 W. Jackson Blvd., Suite 1450, Chicago, IL 60604.

H.      Regardless of whether the Commission in its discretion orders the creation of a Fair Fund for the penalties ordered in this proceeding, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondents agree that in any Related Investor Action, they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondents agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondents by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

## V.

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the findings in this Order are true and admitted by Petrescu, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Petrescu under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Petrescu of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

By the Commission.

Vanessa A. Countryman
Secretary

- 10 -

## Exhibit B:

Final Package to TruCrowd - Cover Letter-Offer-OIP-Prod Cert



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
175 W. Jackson Boulevard, Suite 1450
Chicago, IL 60604

CHICAGO
REGIONAL OFFICE

*For Settlement Purposes Only*

August 12, 2021

**<u>VIA SECURE EMAIL</u>**
TruCrowd, Inc.
c/o Mr. Vincent Petrescu
Chief Executive Officer
505 Harper Dr.
Algonquin, IL 60102.

  Re: *In the Matter of Bangi Investments, LLC* (C-08660)

Dear Mr. Petrescu:

  Enclosed is a copy of the proposed settled Order ("Order") and corresponding Offer of Settlement ("Offer"). The Order reflects the factual findings that the staff currently is willing to recommend to the Commission to resolve this matter as to TruCrowd, Inc. ("TruCrowd").

  Enclosed are a number of documents associated with the proposed offer of settlement. <u>First,</u> enclosed is a copy of the proposed Order, which the Division is prepared to recommend that the Commission institute on a settled basis. <u>Next,</u> I have enclosed a copy of a proposed Offer of Settlement as to TruCrowd. These documents are furnished to TruCrowd for purposes of settlement only. Please note that, as part of its standard practice of reviewing offers of settlement, the Commission staff may require additional edits to the enclosed documents. If there are any such changes, we will let you know so you may determine if you are willing to make an offer of settlement that includes such changes. Further, please understand that, notwithstanding any recommendation made by the staff, the Commission may determine to reject, or accept conditioned upon changes to, the terms of any offer of settlement, including the one reflected in the enclosed documents.  If no agreement is reached on this matter, the staff reserves the right to file pleadings that differ from the ones enclosed

  In addition, the Division of Enforcement will not recommend a settlement to the Commission unless the party wishing to settle certifies, under penalty of perjury, that all documents responsive to Commission subpoenas and formal and informal document requests in this matter have been produced.  In that regard, I have enclosed a document entitled "Certification as to Completeness of Document Production."

If TruCrowd agrees to settle this matter according to the terms set forth in the Offer of Settlement (and if it can certify that it has produced all requested documents), please do the following things by **August 16, 2021 at 5:00 p.m. ET:**

1)     provide me with an electronic pdf and two original, fully executed Offers of Settlement; and

2)     provide me with an electronic pdf and an original, fully executed Certification of Completeness of Document Production.

I look forward to hearing back from you as soon as possible.  Thank you.

Sincerely,

Jerrold H. Kohn
Senior Counsel
Division of Enforcement

Enclosures
  Offer of Settlement of TruCrowd, Inc.
  Order Instituting Proceedings
  Certification as to Completeness of Document Production

# UNITED STATES OF AMERICA
## before the
## SECURITIES AND EXCHANGE COMMISSION

**ADMINISTRATIVE PROCEEDING**
**File No.**

|  |  |
|---|---|
| **In the Matter of**<br><br>**TRUCROWD, INC., DBA**<br>**FUNDANNA, and**<br>**VINCENT PETRESCU**<br><br>**Respondents.** | **OFFER OF SETTLEMENT OF**<br>**TRUCROWD, INC., DBA FUNDANNA** |

### I.

Trucrowd, Inc., dba Fundanna ("TruCrowd" or "Respondent"), pursuant to Rule 240(a) of the Rules of Practice of the Securities and Exchange Commission ("Commission") [17 C.F.R. § 201.240(a)] submits this Offer of Settlement ("Offer") in anticipation of public administrative and cease-and-desist proceedings to be instituted against it by the Commission, pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Sections 15(b), and 21C of the Securities Exchange Act of 1934 ("Exchange Act").

### II.

This Offer is submitted solely for the purpose of settling these proceedings, with the express understanding that it will not be used in any way in these or any other proceedings, unless the Offer is accepted by the Commission. If the Offer is not accepted by the Commission, the Offer is withdrawn without prejudice to Respondent and shall not become a part of the record in these or any other proceedings, except that rejection of the Offer does not affect the continued validity of the waivers pursuant to Rule 240(c)(5) of the Commission's Rules of Practice [17 C.F.R. § 201.240(c)(5)] with respect to any discussions concerning the rejection of the Offer.

### III.

Consistent with the provisions of 17 C.F.R. § 202.5(f), Respondent waives any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein.

**IV.**

Respondent hereby waives any rights under the Equal Access to Justice Act, the Small Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to seek from the United States, or any agency, or any official of the United States acting in his or her official capacity, directly or indirectly, reimbursement of attorney's fees or other fees, expenses, or costs expended by Respondent to defend against this action.  For these purposes, Respondent agrees that Respondent is not the prevailing party in this action since the parties have reached a good faith settlement.

**V.**

By submitting this Offer, Respondent hereby waives, subject to the acceptance of the offer, the rights specified in Rule 240(c)(4)  [17 C.F.R. §201.240(c)(4)] of the Commission's Rules of Practice.  Specifically, Respondent waives:

(1) All hearings pursuant to the statutory provisions under which the proceeding is to be or has been instituted;
(2) The filing of proposed findings of fact and conclusions of law;
(3) Proceedings before, and an initial decision by, a hearing officer;
(4) All post-hearing procedures; and
(5) Judicial Review by any court.

In addition, by submitting this offer, Respondent waives the rights specified in Rule 240(c)(5) [17 C.F.R. § 201.240(c)(5)] of the Commission's Rules of Practice.  Specifically, Respondent waives:

(1) Any and all provisions of the Commission's Rules of Practice or other requirements of law that may be construed to prevent or disqualify any member of the Commission's staff from participating in the preparation of, or advising the Commission as to, any order, opinion, finding of fact, or conclusion of law that may be entered pursuant to this Offer; and

(2) Any right to claim bias or prejudgment by the Commission based on the consideration of or discussions concerning settlement of all or any part of this proceeding.

Respondent also hereby waives service of the Order.

**VI.**

The disgorgement and prejudgment interest referenced in paragraph VII is consistent with equitable principles and does not exceed Respondent's net profits from its violations and will be distributed to harmed investors, if feasible. The Commission will hold funds paid pursuant to paragraph VII in an account at the United States Treasury pending a decision whether the Commission in its discretion will seek to distribute funds. If a distribution is

determined feasible and the Commission makes a distribution, upon approval of the distribution final accounting by the Commission, any amounts remaining that are infeasible to return to investors, and any amounts returned to the Commission in the future that are infeasible to return to investors, may be transferred to the general fund of the U.S. Treasury, subject to Section 21F(g)(3) of the Exchange Act.

## VII.

Respondent hereby:

A.      Admits the jurisdiction of the Commission over it and over the matters set forth in the Order Instituting Public Administrative and Cease-and-Desist Proceedings Pursuant to Sections 8A of the Securities Act of 1933, Sections 4C, 15(b), and 21C of the Securities Exchange Act of 1934, and Rule 102(e) of Commission's Rules of Practice, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), which is attached;

B.      Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission or in which the Commission is a party and without admitting or denying the findings contained in the Order, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, consents to the entry of the Order, in which the Commission:

1.      finds that Respondent TruCrowd willfully violated Section 4A(a)(5) of the Securities Act and Rule 301(c)(2) thereunder.

2.      orders Respondent TruCrowd to cease and desist from committing or causing any violations and any future violations of Section 4A(a)(5) of the Securities Act and Rule 301(c)(2) thereunder.

3.      orders that Respondent TruCrowd is censured.

4.      orders that Respondent TruCrowd shall, within 10 days of the entry of this Order, pay disgorgement of $129,380 and prejudgment interest of $16,738 to the Securities and Exchange Commission.  The Commission will hold funds paid pursuant to this paragraph in an account at the United States Treasury pending a decision whether the Commission, in its discretion, will seek to distribute funds or, transfer them to the general fund of the United States Treasury, subject to Section 21F(g)(3).  If timely payment is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600.

5.      orders that Respondent TruCrowd shall, within 10 days of the entry of this Order, pay a civil money penalty in the amount of $97,500 to the Securities and Exchange Commission. The Commission may distribute civil money penalties collected in this proceeding if, in its discretion, the Commission orders the establishment of a Fair Fund  pursuant to 15 U.S.C. § 7246, Section 308(a) of the Sarbanes-Oxley Act of 2002, as amended. The Commission will hold funds paid pursuant to this paragraph in an account at the United States Treasury pending a decision whether the Commission, in its discretion, will seek to distribute funds or, subject to Exchange Act Section 21F(g)(3),

- 3 -

transfer them to the general fund of the United States Treasury.  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

Payment must be made in one of the following ways:

    (1)    Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

    (2)    Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

    (3)    Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying TruCrowd as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Paul A. Montoya, Associate Regional Director Chicago Regional Office, Securities and Exchange Commission, 175 W. Jackson Blvd., Suite 1450, Chicago, IL 60604.

    6.    Regardless of whether the Commission in its discretion orders the creation of a Fair Fund for the penalties ordered in this proceeding, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

**VIII**.

Respondent understands and agrees to comply with the terms of 17 C.F.R § 202.5(e), which provides in part that it is the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceedings," and "a refusal to admit the allegations is equivalent to a denial, unless the defendant or respondent states that it neither admits nor denies the allegations." As part of Respondent's agreement to comply with the terms of Section 202.5(e), Respondent: (i) will not take any action or make or permit to be made any public statement denying, directly or indirectly, any finding in the Order or creating the impression that the Order is without factual basis; (ii) will not make or permit to be made any public statement to the effect that Respondent does not admit the findings of the Order, or that the Offer contains no admission of the findings, without also stating that the Respondent does not deny the findings; and (iii) upon the filing of this Offer of Settlement, Respondent hereby withdraws any papers previously filed in this proceeding to the extent that they deny, directly or indirectly, any finding in the Order. If Respondent breaches this agreement, the Division of Enforcement may petition the Commission to vacate the Order and restore this proceeding to its active docket. Nothing in this provision affects Respondent's: (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party.

**IX.**

Respondent agrees that it shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source including, but not limited to, payment made pursuant to any insurance policy, with regard to any penalty amounts that Respondent shall pay pursuant to this Order, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors. Respondent further agrees that it shall not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state or local tax for any penalty amounts that Respondent shall pay pursuant to this Order, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors.

**X.**

Respondent states that it has read and understands the foregoing Offer, that this Offer is made voluntarily, and that no promises, offers, threats, or inducements of any kind or nature

whatsoever have been made by the Commission or any member, officer, employee, agent, or representative of the Commission in consideration of this Offer or otherwise to induce it to submit to this Offer.

_____ Day of _____

_____
Vincent Petrescu, Chief Executive Officer
TruCrowd, Inc.


**STATE OF ILLINOIS**                    **}**
                                         **}**      **SS:**
**COUNTY OF _____ }**

       The foregoing instrument was acknowledged before me this ___day of _____, 2021, by VINCENT PETRESCU, who ___is personally known to me or ___who has produced an Illinois driver's license as identification and who did take an oath and acknowledged executing the foregoing Offer of Settlement with full authority to do on behalf of TruCrowd, Inc. as its Chief Executive Officer.


_____
Notary Public
State of Illinois
Commission Number        **:**
Commission Expiration     **:**

**TRUCROWD, INC.**
**LIMITED CERTIFICATE OF CORPORATE RESOLUTION**

      I, Vincent Petrescu, do hereby certify that I am the duly elected, qualified and acting Chief Executive Officer of TruCrowd, Inc., a Delaware corporation, and that the following is a complete and accurate copy of a resolution adopted by the Board of Directors of TruCrowd, Inc., at a meeting held on _____, 2021 at which a quorum was present and resolved as follows:

      **RESOLVED:** That Vincent Petrescu, the Chief Executive Officer of TruCrowd, Inc. be and hereby is authorized to act on behalf of TruCrowd, Inc., and in his sole discretion, to negotiate, approve, and execute the Offer of Settlement of TruCrowd, Inc. attached hereto in connection with the *In the Matter of TruCrowd, Inc., and VINCENT PETRESCU* and the aforementioned be and hereby is authorized to undertake such actions as he may deem necessary and advisable, including the execution of documentation as may be required, in order to carry out the foregoing.

      I further certify that the aforesaid resolution has not been amended or revoked in any respect and remains in full force and effect.

      IN WITNESS WHEREOF, I have executed this Certificate as a sealed instrument this ____ day of _____, 2021.

By: _____
    Vincent Petrescu, Chief Executive Officer
    TruCrowd, Inc.

**STATE OF ILLINOIS**       }
                           }    **SS:**
**COUNTY OF** _____ }

      The foregoing instrument was acknowledged before me this ___ day of _____, 2021, by VINCENT PETRESCU, who ___is personally known to me or ___who has produced an Illinois driver's license as identification and who did take an oath

Notary Public State of Illinois
Commission Number      **:**
Commission Expiration     **:**

# UNITED STATES OF AMERICA
## Before the
## SECURITIES AND EXCHANGE COMMISSION

**SECURITES ACT OF 1933**
**Release No.**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No.**

**ACCOUNTING AND AUDITING ENFORCEMENT**
**Release No.**

**ADMINISTRATIVE PROCEEDING**
**File No.**

| | |
|---|---|
| **In the Matter of**<br><br>**TRUCROWD, INC., DBA FUNDANNA, and VINCENT PETRESCU**<br><br>**Respondents.** | **ORDER INSTITUTING PUBLIC ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933, SECTIONS 4C, 15(b), AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934, AND RULE 102(e) OF THE COMMISSION'S RULES OF PRACTICE, MAKING  FINDINGS, AND IMPOSING REMEDIAL  SANCTIONS AND A CEASE-AND-DESIST ORDER** |

## I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Sections 15(b) and 21C of the Securities Exchange Act of 1934 ("Exchange Act") against TruCrowd, Inc., DBA Fundanna ("TruCrowd") and Vincent Petrescu ("Petrescu") (collectively, "Respondents"), and that public administrative and cease-and-desist proceedings be, and hereby

are, instituted against Petrescu pursuant to Sections 4C[1] and 21C of the Exchange Act and Rule 102(e)(1)(iii) of the Commission's Rules of Practice.[2]

## II.

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement (the "Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, and except as provided herein in Section V, Respondents consent to the entry of this Order Instituting Public Administrative and Cease-and-Desist Proceedings Pursuant to Sections 8A of the Securities Act of 1933, Sections 4C, 15(b), and 21C of the Securities Exchange Act of 1934, and Rule 102(e) of Commission's Rules of Practice, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

## III.

On the basis of this Order and Respondents' Offers, the Commission finds[3] that:

### Summary

1.     This matter concerns fraudulent crowdfunding offerings hosted by TruCrowd, an SEC registered funding portal founded by Petrescu, who is the firm's chief executive officer. The crowdfunding offering frauds were perpetrated by Robert Shumake ("Shumake") alongside associates, Nicole T. Birch ("Birch") and Willard L. Jackson ("Jackson"), through two companies, Transatlantic Real Estate, LLC ("Transatlantic Real Estate") and 420 Real Estate,

---

[1]     Section 4C provides, in relevant part, that:

The Commission may censure any person, or deny, temporarily or permanently, to any person the privilege of appearing or practicing before the Commission in any way, if that person is found . . . (1) not to possess the requisite qualifications to represent others; (2) to be lacking in character or integrity, or to have engaged in unethical or improper professional conduct; or (3) to have willfully violated, or willfully aided and abetted the violation of, any provision of the securities laws or the rules and regulations issued thereunder.

[2]     Rule 102(e)(1)(iii) provides, in pertinent part, that:

The Commission may . . . deny, temporarily or permanently, the privilege of appearing or practicing before it . . . to any person who is found…to have willfully violated, or willfully aided and abetted the violation of any provision of the Federal securities laws or the rules and regulations thereunder.

[3]     The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

LLC ("420 Real Estate") (collectively, "Crowdfunding Offerings"). Shumake, who had a criminal history, concealed from the public his involvement with the Crowdfunding Offerings with the assistance of Birch and Jackson.

2.  Through TruCrowd's platform, Transatlantic Real Estate and 420 Real Estate raised $1,020,100 between September 2018 and May 2019 and $888,180 between May 2019 and June 2020, respectively. The Form Cs that Transatlantic Real Estate and 420 Real Estate filed in connection with their respective Crowdfunding Offerings represented that the intended use of the offering proceeds was to acquire or improve real estate for use in the cannabis and hemp industries. However, neither Transatlantic Real Estate nor 420 Real Estate spent any of the funds raised on real estate. Instead, Shumake, Birch, and Jackson diverted investor funds for their personal use and for purposes unrelated to the Crowdfunding Offerings.

3.  TruCrowd and Petrescu were gatekeepers. As a funding portal and its officer, TruCrowd and Petrescu were responsible for, among other things, taking measures to reduce the risk of fraud in connection with the Crowdfunding Offerings. Petrescu granted Shumake, Birch, and Jackson access to TruCrowd's platform. Petrescu disregarded certain red flags during the Transatlantic Real Estate offering regarding Shumake's criminal history and role with the company. These red flags indicated potential fraud or otherwise raised investor protection concerns. Nonetheless, Petrescu allowed the Transatlantic Real Estate offering to continue and close. Subsequently, Petrescu permitted Shumake and Jackson to use TruCrowd's platform for the 420 Real Estate offering. Notwithstanding these red flags, in addition to investor complaints regarding the Crowdfunding Offerings, Petrescu allowed the 420 Real Estate offering to remain on TruCrowd's platform until it closed.

4.  Under these facts and circumstances, TruCrowd and Petrescu willfully violated Section 4A(a)(5) of the Securities Act and Rule 301(c)(2) thereunder.

## Respondents

5.  **TruCrowd Inc., DBA Fundanna**, is a Delaware corporation with its principal place of business in Schaumburg, Illinois. TruCrowd has been registered with the SEC and FINRA as a funding portal since February 2016.

6.  **Vincent Petrescu,** age 49, resides in Algonquin, Illinois. Petrescu is the founder, CEO, and majority owner of TruCrowd. Petrescu was a certified public accountant in the state of Illinois and Indiana during the relevant period. Petrescu's Indiana CPA license expired on June 30, 2021.

## Relevant Entities and Individual

7.  **Transatlantic Real Estate, LLC** was a California limited liability company formed in August 2018 with its principal place of business in Grosse Pointe Farms, Michigan. Transatlantic Real Estate purported to acquire and lease properties in the cannabis industry. Birch was its CEO. Transatlantic Real Estate filed a Form C with the Commission and conducted a crowdfunding offering between September 2018 and May 2019. Transatlantic Real Estate was dissolved in July 2021.

8.      **420 Real Estate, LLC** is a Texas limited liability company formed in April 2019 with its principal place of business in Houston, Texas. 420 Real Estate purports to acquire and lease properties in the hemp industry. Jackson is its CEO. 420 Real Estate filed a Form C with the Commission and conducted a crowdfunding offering between May 2019 and June 2020.

9.      **Robert Shumake**, age 53, resides in Bloomfield Hills, Michigan. In December 2017, in connection with a home mortgage scheme, Shumake pled guilty in the state of Michigan to two misdemeanor counts of violating Michigan's Credit Services Protection Act, and on behalf of his business, to two felony counts of obtaining money by false pretense. The judge sentenced him to probation, which terminated in May 2019. The sentencing order prohibited Shumake from working in a position where he had direct control over, or access to, another person's money during the probationary period.

## The Crowdfunding Offerings

10.     Petrescu, as TruCrowd's CEO, is responsible for selecting which issuers and associated persons may use TruCrowd's funding portal for crowdfunding offerings. Petrescu also assists issuers with preparing and filing the Form C crowdfunding offering statements.

11.     In August 2018, TruCrowd, after Petrescu spoke with Shumake and Birch, hosted Transatlantic Real Estate's crowdfunding offering on TruCrowd's platform.

12.     Transatlantic Real Estate's offering statement omitted Shumake's involvement, named Birch as the sole officer, and represented that Transatlantic Real Estate was a real estate company in the cannabis industry.

13.     Between September 2018 and May 2019, Transatlantic Real Estate raised $1,020,100 from multiple investors residing in different states. Each investor received a convertible note purportedly earning 15% interest annually in exchange for their investment.

14.     In 2019, TruCrowd, after Petrescu spoke with Shumake and Jackson, hosted 420 Real Estate's crowdfunding offering on TruCrowd's platform.

15.     Nearly identical to Transatlantic Real Estate's offering statement, 420 Real Estate's offering statement omitted Shumake's involvement, named Jackson as the sole officer, and represented that 420 Real Estate was a real estate company that acquired and leased properties in the hemp industry.

16.     Between May 2019 and June 2020, 420 Real Estate raised $888,180 from multiple investors residing in different states. In exchange for their investment, each investor received a convertible note purportedly earning 10% interest annually.

## Petrescu Ignored Red Flags

17.     Petrescu disregarded red flags concerning Shumake and his role with the Crowdfunding Offerings; the red flags indicated potential fraud or otherwise raised investor protection concerns. These red flags appeared during the Transatlantic Real Estate offering and

continued throughout the subsequent 420 Real Estate offering. Petrescu failed to follow up on the red flags to reduce the risk of fraud.

18.     Although Transatlantic Real Estate's offering statement did not disclose Shumake's involvement, Shumake co-managed Transatlantic Real Estate with Birch. Likewise, Birch told Petrescu that she was the sole officer and that Shumake only provided marketing services. However, Shumake routinely coordinated with Petrescu to address non-marketing matters. For example:

   a.   Petrescu copied Shumake on material discussions regarding the drafting and filing of Transatlantic Real Estate's offering statement.

   b.   Petrescu took direction from Shumake concerning communications with existing and prospective investors.

   c.   Petrescu referred Shumake to a transfer agent which Shumake engaged on behalf of Transatlantic Real Estate.

   d.   Petrescu considered Shumake a Transatlantic Real Estate representative and, therefore, granted Shumake access to information pertaining to the Transatlantic Real Estate offering and its investors on TruCrowd's internal platform.

19.     Despite Shumake's involvement with the Transatlantic Real Estate offering, Petrescu never questioned why the offering statement did not identify Shumake.

20.     During the Transatlantic Real Estate offering, Petrescu disregarded red flags regarding Shumake, which indicated potential fraud or otherwise raised investor protection concerns. In November 2018, two months after the Transatlantic Real Estate offering opened, Petrescu received an email from Birch, which she forwarded from an individual who had performed services for Transatlantic Real Estate. This individual notified Birch and Shumake that he had referred the Transatlantic Real Estate account for collections and warned them of the potential impact of "SEC, Bad Actor Check," if they did not resolve this matter. Yet, Petrescu did not question Birch or Shumake regarding this email or take any steps to investigate the issues raised in this email.

21.     In December 2018, an experienced securities attorney emailed Petrescu information concerning Shumake's criminal past, which raised investor protection concerns. Per Petrescu's referral, this attorney met with Birch and Shumake to explore a potential securities offering for another entity. The attorney informed Petrescu that he declined to work with Birch and Shumake because their lack of industry experience constituted a "red flag" for him.

22.     In the same email, the attorney included a link to an April 2017 news report about Shumake's criminal case. The news article discussed the criminal case against Shumake brought by the Michigan Attorney General alleging that Shumake was behind a scheme to cheat people who were trying to save their homes from foreclosure. Petrescu replied, "That does not look good" and said he would "search more." Yet, Petrescu did not follow up on this red flag by, for example, investigating Shumake's past or role with Transatlantic Real Estate.

- 5 -

23.     Petrescu permitted the Transatlantic Real Estate offering to proceed on TruCrowd's platform until it closed in May 2019.

24.     After the Transatlantic Real Estate offering closed, Petrescu agreed to work with Shumake again in May 2019 and host the subsequent 420 Real Estate offering on TruCrowd's platform. In addition to the above-mentioned red flags, Petrescu continued to ignore red flags throughout the 420 Real Estate Offering. For example:

   a.   Like the Transatlantic Real Estate offering, Shumake co-managed the 420 Real Estate offering. The 420 Real Estate offering statement, however, was nearly identical to the Transatlantic Real Estate offering statement and omitted Shumake's involvement.

   b.   In mid-2020 and before the 420 Real Estate offering closed, both Birch and Jackson separately informed Petrescu that Shumake acted improperly. They instructed Petrescu to stop taking directions from Shumake and to deny Shumake access to information relating to the Crowdfunding Offerings.

   c.   Around the same time and prior to the closing of the 420 Real Estate offering, Petrescu, through TruCrowd's platform, received investor complaints and concerns regarding both Transatlantic Real Estate and 420 Real Estate's inadequate management and poor communications concerning the Crowdfunding Offerings. Some investors questioned the legitimacy of the Crowdfunding Offerings.

25.     Notwithstanding the red flags raised in the Transatlantic Real Estate offering and the red flags that persisted in the 420 Real Estate offering, Petrescu did not investigate Shumake's role with the 420 Real Estate offering or take any steps to research Shumake's past.

26.     Petrescu allowed the 420 Real Estate offering to continue on TruCrowd's platform until it closed in June 2020.

**Shumake, Birch, and Jackson Diverted Investor
Funds for Personal Use and other Improper Purposes**

27.     TruCrowd and Petrescu's failure to follow up on the red flags to reduce the risk of fraud enabled Shumake, Birch, and Jackson to divert investor funds for their own use and other improper purposes.

28.     Contrary to the disclosures in the Transatlantic Real Estate offering statement, Shumake and Birch diverted hundreds of thousands of dollars in investment proceeds to themselves and for improper purposes. Transatlantic Real Estate did not use any investment proceeds to purchase or improve property. Transatlantic Real Estate investors have not received any monetary return on their investment.

29.     Contrary to the disclosures in the 420 Real Estate offering statement, Shumake and Jackson diverted hundreds of thousands of dollars in investment proceeds to themselves and for improper purposes. 420 Real Estate did not use any investment proceeds to purchase or

improve property. 420 Real Estate investors have not received any monetary return on their investment.

## Violations

30.     As a result of the conduct described above, Respondents TruCrowd and Petrescu willfully violated Section 4A(a)(5) of the Securities Act and Rule 301(c)(2) thereunder.

## Disgorgement and Civil Penalties

31.     The disgorgement and prejudgment interest ordered in paragraph IV.F is consistent with equitable principles and does not exceed Respondent TruCrowd's net profits from its violations and will be distributed to harmed investors, if feasible. The Commission will hold funds paid pursuant to paragraphs IV.F and IV.G in an account at the United States Treasury pending a decision whether the Commission in its discretion will seek to distribute funds. If a distribution is determined feasible and the Commission makes a distribution, upon approval of the distribution final accounting by the Commission, any amounts remaining that are infeasible to return to investors, and any amounts returned to the Commission in the future that are infeasible to return to investors, may be transferred to the general fund of the U.S. Treasury, subject to Section 21F(g)(3) of the Exchange Act.

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondents' Offers.

Accordingly, it is hereby ORDERED, effective immediately, that:

A.     Respondents TruCrowd and Petrescu shall cease and desist from committing or causing any violations and any future violations of Section 4A(a)(5) of the Securities Act and Rule 301(c)(2) thereunder.

B.     Respondent TruCrowd is censured.

C.     Respondent Petrescu is denied from appearing or practicing before the Commission as an accountant.

D.     After three years from the date of this order, Petrescu may request that the Commission consider his reinstatement by submitting an application (attention: Office of the Chief Accountant) to resume appearing or practicing before the Commission as:

1.     a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission (other than as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Securities Exchange Act of 1934). Such an application must satisfy the Commission that Petrescu's work in his practice before the Commission as an accountant will be reviewed either by the

- 7 -

independent audit committee of the public company for which he works or in some other acceptable manner, as long as he practices before the Commission in this capacity; and/or

2.        a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Securities Exchange Act of 1934. Such an application will be considered on a facts and circumstances basis with respect to such membership, and the applicant's burden of demonstrating good cause for reinstatement will be particularly high given the role of the audit committee in financial and accounting matters; and/or

3.        an independent accountant.

Such an application must satisfy the Commission that:

(a)        Petrescu, or the public accounting firm with which he is associated, is registered with the Public Company Accounting Oversight Board ("Board") in accordance with the Sarbanes-Oxley Act of 2002, and such registration continues to be effective;

(b)        Petrescu, or the registered public accounting firm with which he is associated, has been inspected by the Board and that inspection did not identify any criticisms of or potential defects in the respondent's or the firm's quality control system that would indicate that Petrescu will not receive appropriate supervision;

(c)        Petrescu has resolved all disciplinary issues with the Board, and has complied with all terms and conditions of any sanctions imposed by the Board (other than reinstatement by the Commission); and

(d)        Petrescu acknowledges his responsibility, as long as he appears or practices before the Commission as an independent accountant, to comply with all requirements of the Commission and the Board, including, but not limited to, all requirements relating to registration, inspections, concurring partner reviews and quality control standards.

E.        The Commission will consider an application by Petrescu to resume appearing or practicing before the Commission provided that his state CPA license is current and he has resolved all other disciplinary issues with the applicable state boards of accountancy. However, if state licensure is dependent on reinstatement by the Commission, the Commission will consider an application on its other merits. The Commission's review may include consideration of, in addition to the matters referenced above, any other matters relating to Petrescu's character, integrity, professional conduct, or qualifications to appear or practice before the Commission as

an accountant. Whether an application demonstrates good cause will be considered on a facts and circumstances basis with due regard for protecting the integrity of the Commission's processes.

       F.      Respondent TruCrowd shall, within 10 days of the entry of this Order, pay disgorgement of $129,380 and prejudgment interest of $16,738 to the Securities and Exchange Commission. The Commission will hold funds paid pursuant to this paragraph in an account at the United States Treasury pending a decision whether the Commission, in its discretion, will seek to distribute funds or, transfer them to the general fund of the United States Treasury, subject to Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600.

       G.      Respondents TruCrowd and Petrescu shall, within 10 days of the entry of this Order, pay civil money penalties in the amounts of $97,500 and $9,700, respectively, to the Securities and Exchange Commission. The Commission may distribute civil money penalties collected in this proceeding if, in its discretion, the Commission orders the establishment of a Fair Fund pursuant to 15 U.S.C. § 7246, Section 308(a) of the Sarbanes-Oxley Act of 2002. The Commission will hold funds paid pursuant to this paragraph in an account at the United States Treasury pending a decision whether the Commission, in its discretion, will seek to distribute funds or, subject to Exchange Act Section 21F(g)(3), transfer them to the general fund of the United States Treasury. If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

Payment must be made in one of the following ways:

       (1)      Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

       (2)      Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

       (3)      Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

       Enterprise Services Center
       Accounts Receivable Branch
       HQ Bldg., Room 181, AMZ-341
       6500 South MacArthur Boulevard
       Oklahoma City, OK 73169

       Payments by check or money order must be accompanied by a cover letter identifying TruCrowd and/or Petrescu as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Paul A. Montoya, Chicago Regional Office, Securities and Exchange Commission, 175 W. Jackson Blvd., Suite 1450, Chicago, IL 60604.

H.      Regardless of whether the Commission in its discretion orders the creation of a Fair Fund for the penalties ordered in this proceeding, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondents agree that in any Related Investor Action, they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondents agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondents by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

**V.**

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the findings in this Order are true and admitted by Petrescu, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Petrescu under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Petrescu of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

By the Commission.

Vanessa A. Countryman
Secretary

- 10 -

## CERTIFICATION AS TO COMPLETENESS
## OF DOCUMENT PRODUCTION

Vincent Petrescu, the Chief Executive Officer of TruCrowd, Inc. (the "Recipient"), hereby certifies as follows:

1.      The Recipient hereby acknowledges and agrees that in settling enforcement action against the Recipient the Commission has relied upon the completeness of, among other things, the Recipient's production of documents in response to all Commission subpoenas, document requests, and requests for voluntary production of documents to the Recipient in connection with this matter, subject to any modifications agreed to in writing by Commission staff ("the Commission's Document Demands").

2.      I have made diligent inquiry of and requested production from all of the Recipient's officers, directors, employees, and agents reasonably likely to have possession of documents responsive to the Commission's Document Demands. In addition, a diligent search has been made of all other files in Recipient's possession, custody, or control that are reasonably likely to contain responsive documents, including but not limited to general file areas, off-site document files, e-mail and archive files, and all other original and back-up electronic and computer files and systems.

3.      To the best of my knowledge, all responsive documents in the possession, custody, or control of the Recipient and its officers, directors, employees, and agents have been produced to the Commission or identified in a privilege log submitted to the Commission. The Recipient has a good faith basis to believe that a bona fide privilege,

recognized under applicable law, applies to each responsive document identified on a

privilege log and not produced to the Commission.

      I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____, 2021.

 

_____
Vincent Petrescu
Chief Executive Officer
TruCrowd, Inc.
505 Harper Dr.
Algonquin, IL 60102
(847) 873-5335

## **Exhibit C**:

SEC Compliant _ Confidential Attorney Client Communication and Work Product _ Claims 9 26 21

# Allegations

31. Birch, with Petrescu's assistance, wrote the Transatlantic Real Estate Form C and offering statement. Birch and Petrescu kept Shumake informed about the drafting process by copying him on substantive email discussions about the offering statement. Birch, Shumake, and Petrescu also each weighed in on the steps necessary to kick off and promote the Transatlantic Real Estate offering to investors.

Answer:
We offer each issuer a template of the Form C (https://www.sec.gov/files/formc.pdf) then we guide them through it when they have questions then we make sure all the questions are answered and we check for inconsistencies.

As you see on the SEC Form (https://www.sec.gov/files/formc.pdf) starting at page 6, we have Question #4:  "DIRECTORS OF THE COMPANY" then, Question #5 "OFFICERS OF THE COMPANY" and then Question #7: "PRINCIPAL SECURITY HOLDERS." Sumake was not part of any of these categories.

I could have fit the Question #4 or Question #5 under "(and any persons occupying a similar status or performing a similar function)"

Even by the SEC admission while the SEC completed its investigation (or was close to complete it) Sumake did not fit in the "Control Person" category.

I kept Sumake informed because:
1. When the issuer has a small team, everyone has multiple roles.
2. As a marketing person - Shumake was  supposed to have a role in how the story of Transatlantic will be conveyed to the potential investors.
3. In the phone calls I had with Birch and Shumake he was talking a lot about influencer and social media and how to explain everything in the voice of their audience.

51. Shumake arranged for TruCrowd to serve as the crowdfunding portal for the 420 Real Estate offering and put Jackson in touch with Petrescu.

Answer:
That is correct. We even have Scouting Agreements where we pay Scouts to bring us issuers.

Both Birch (a security lawyer) and Jackson (that seem to be a reputable business person - at that point in time) gave me the impression that they can think on their own and and not easily to be manipulated by anyone.

54. Petrescu and others participated in the drafting of the 420 Real Estate Form C and offering statement. Petrescu and others kept Jackson and Shumake informed about the drafting process by copying him on substantive email discussions about the Form C and offering statement.

Answer:
Yes. See answer for #31 above.


80. Petrescu, acting on behalf of TruCrowd, permitted the Transatlantic Real Estate and 420 Real Estate offerings to proceed despite multiple warning signs of possible fraud or other harm to investors.

Answer:
When Transatlantic started there were no signs of possible fraud.

The investors' emails were concerned with lack of responses from the issuers - especially Transatlantic/Birch. That is a bad business practice, but I blamed it on the small team of the issuer.


81. Petrescu, acting on behalf of TruCrowd, worked with both Shumake and Birch to file the Transatlantic Real Estate Form C and offering statement.

Answer:
As an entrepreneur myself I know that when I find a person that can get this done, in general, I ask that person to help with other tasks that could be outside of the original understand I had with that person. If that person agrees, we have a new understanding of what that person can help with.

In my view, it was the same with Birch - she found that Shumale can complete tasks so she asked him for help with other tasks.


82. According to Petrescu, Birch told him that she was the sole officer of Transatlantic Real Estate and that Shumake only provided marketing services. However, Shumake routinely coordinated with Petrescu to address non-marketing matters for the company, such as investor communications and lining up a transfer agent.

Answer:

I had relied on Birch representation that sse is the sole officer.

**From:** Vincent (@truCrowd) <vp@truCrowd.com>
**Sent:** Thursday, September 6, 2018 11:52 AM
**To:** Nicole Birch <nbirch@hbassociateslaw.com>
**Subject:** RE: Final - reviewed financials

Hi, Nicole.

Are you the only director and Officer?

| | Maximum Amount | 200,000 | $1,000,000 | $898,000 |
| --- | --- | --- | --- | --- |

### DIRECTORS OF THE COMPANY

4. Provide the following information about each director (and any persons occupying a similar status or performing a similar function) of the issuer:

Name: Nicole Birch, Esq.      Dates of Board Service: August 2018 to present

Principal Occupation:      CEO, Director, Chairman
Employer: Transatlantic Real Estate, LLC      Dates of Service: August 2018 to present
Employer's principal business: _____

List all positions and offices with the issuer held and the period of time in which the director served in the position or office:

Position: CEO      Dates of Service: 8/2018 to present
Position: Director      Dates of Service: 8/2018 to present
Position: Chairman      Dates of Service: 8/2018 to present

Business Experience: List the employers, titles and dates of positions held during past three years with an indication of job responsibilities:

Employer: HB Associates, PC
Employer's principal business: legal services, corporate consulting with companies to structure, raise capital and manage real estate portfolios
Title: Managing Director      Dates of Service: April 2013 to present
Responsibilities: manage, direct and oversee firm's operations

Employer: _____

Her answer:



On the Form C that Birch created she mentioned only herself.
In addition, same Form C (https://www.sec.gov/files/formc.pdf) at page 17, Question #30 as a series of 8 sub questions related to:

> "30. With respect to the issuer, any predecessor of the issuer, any affil iated issuer, any director, officer, general partner or managing member of the issuer, any beneficial owner of 20 percent or more of the issuer's outstanding voting equity securities, calculated in the same form as described in Question 6 of this Question and Answer form at, any promoter connected with the issuer in any capacity at the time of such sale, any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with such sal e of securities, or any general partner, director, officer or managing member of any such solicitor, prior to May 16, 2016:"

Birch responded NO to all questions. Shumake involvement would have resulted some of those some more explanations.

Then, while applying for the escrow account Birch had to again answer those questions in electronic format and her answer was again No to all the questions.

Explanation (same as Item 81 above on why Shumake appeared to be involved more than marketing only.)
As an entrepreneur myself I know that when I find a person that can get this done, in general, I ask that person to help with other tasks that could be outside of the original understand I had with that person. If that person agrees, we have a new understanding of what that person can help with.

In my view, it was the same with Birch - she found that Shumale can complete tasks so she asked him for help with other tasks.

83. Petrescu did not question why the Transatlantic Real Estate offering statement omitted any mention of Shumake's involvement with the company and the offering.

Answer: Shumake did not fit the Control Person definition.

85. This individual's email to Birch and Shumake complained that they owed him money for services he had performed on the offering, stated that he had referred Transatlantic Real Estate for collections, and warned them of the potential impact of "SEC, Bad Actor Check."
86. These emails required action by Petrescu, and through him, by TruCrowd. Regulation Crowdfunding [17 C.F.R. §§227.301(c)] requires funding portals and their associated persons to conduct a background and securities enforcement regulatory history check (commonly referred to as a "bad actor" on each issuer and the issuer's officers and directors (and any persons performing a similar function) to determine if they are subject to disqualification from participating in crowdfunding under Rule 503 of Regulation Crowdfunding, and to remove an offering from their platform if they become aware of information after they have granted access that causes them to reasonably believe that the issuer or the offering presents the potential for fraud or otherwise raises concerns about investor protection.
87. Even after receiving this email, Petrescu never requested a bad actor check or ran a background check on Shumake. If Petrescu had done so, he would have learned of Shumake's criminal history.

Answer:
I don't think I have that email, but at that time I had a phone call with Birch where she mention that this individual are threatening them - including reporting the to the SEC to make them bad actors.

This individual is the Scout that introduced Transatlantic to TruCrowd and somehow he was under the impression that he can get paid a success fee from the moment raised. At that time when he sent the email Transaltantic offering page showed (maybe) 200,000 USD in funds committed (not invested) and he thought he should get paid a commission from that.

I asked Birch if they have another agreement with this individual where they promised him a success fee and that there is illegal to pay anyone that is not a BD or a FP a fee based on success. Her answer was that no, they don't have such agreement  and had no idea how the individual came up with that claim.

88. A short time later, in December 2018, while the Transatlantic Real Estate offering was still raising funds from investors, Petrescu referred Birch and Shumake to an experienced securities attorney, to explore the possibility of a Regulation A offering for Bangi.

Answer:
That is correct. However the Reg A was not for Transatlantic, but for another company for which I did not know their control structure.

When the securities lawyer sent me that email I saw it as referring with Shumake as a control person of that possible Reg A offering.

92. Despite admitting that he needed "to search some more," Petrescu did not follow up on this red flag. Instead, Petrescu allowed the Transatlantic Real Estate offering to continue on TruCrowd's platform.

Answer:
After I received the email from the lawyer, I talked to Birch about what I learned - to make her aware that her hired help - Shumake might have legal issues she was not aware of. She told me that she knows about that and that she is not concerned. (something in that direction).

Not having Shumake as a Control Person on Transatlantic, at that point, I saw nothing else to be done. I

93. Then, in or about April 2019, Petrescu agreed to work with Shumake again and to host the 420 Real Estate offering on TruCrowd's portal.

Answer:
Jackson - CEO of 420 Real Estate was the only Control Person for that company. He too planed to use Shumake connections and skills to raise funds.

94. Petrescu however, did not request a bad actor check on Shumake or otherwise investigate Shumake's past before agreeing to host the 420 Real Estate offering.

Answer:

Shumake was not a Control Person of that issuer.

95. The 420 Real Estate offering statement was nearly identical to the Transatlantic Real Estate offering statement.

Answer:
Jackson wanted to replicate the Transatlantic successful raise so he wanted to do the same thing - so he copied the business plan and the story around that business plan, while using similar marketing channels (thru Shumake - as I understood at that point).

96. Nevertheless, Petrescu did not question the representations in those documents that Jackson was the issuer's sole officer or the omission of any mention of Shumake's involvement with the issuer or the offering.

Answer:
Shumake was not a Control Person. Jackson was the only one.

97. During and after both the Transatlantic Real Estate offering and the 420 Real Estate offering, Petrescu, and through him TruCrowd, received a series of investor complaints about both the Transatlantic Real Estate and the 420 Real Estate offerings.
      a)   Investors asked whether the offerings were scams.
      b)   They complained to Petrescu that the issuers were not responding to inquiries.
      c)    Some investors complained that they had not received certificates for their investments.
      d)   Others asked for the refund of their investments.
All these emails should have raised questions for Petrescu whether the offerings presented the risk of fraud or investor harm, especially in light of the email exchanges described above.

Answer:
      a)   Investors asked if it was a scam because the issuer (Mostly Transataltic) was not answering their emails and phone calls.
      b)   That is why they thought it might be scam
      c)   When a investor get invested (the investment is final) they receive an email (automated) with PDF file that represents their certificate. When an investor reaches TruCrowd for that - we send another PDF file, even if we can see that the initial email was sent by the system. Therefore this is not a fault of any issuer - just the investor skipping/missing the fort email.
      d)   That is normal and all issuers have this type of request. While the funds are in the escrow the issuer has to refund that investor because the investment was not final. Some issuers, even if the investors were invested, and the investment is final they

accommodate the investors that are asking for a refund. SOmetimes the investors change their minds

98. Petrescu's responses to the investor emails was to assure investors that the offerings were not scams, and to represent that he had run bad actor checks

Answer:
We had bad actor of the company and its Control Persons. Shumake was not a Control Person.

99. Petrescu forwarded some of the investor complaints to Shumake, Jackson, and Birch.

Answer:
Yes, I wanted everyone involved in any capacity (control person or hired help) to help in any way possible. Especially when Birch stopped answering Investors's emails and phone numbers.

100. On April 16, 2020, Jackson informed Petrescu that Shumake had acted improperly. Jackson told Petrescu that it is "very disappointing to learn that you took direction (without my knowledge) from Robert Shumake to redirect the approval of funds process for 420 Real Estate crowdfund. He is not a party to my agreement with you or [TruCrowd]." In a response on the same day copying Petrescu, Shumake stated that the 420 Real Estate offering was designed to support Bangi, Jackson's business, Ebony, and the "263k used by me to seed the operation." Yet, this email did not prompt Petrescu to question why Bangi, Ebony, and payments to Shumake were omitted from the 420 Real Estate Form C and offering statement.

Answer:
All our conversation pointed in the direction that Shumake was working under Jackson orders.

That email was the confirmation that Shumake was not, in fact, a Control Person of 420 Real Estate.

In 420 Form C there are disclosed about 30% of the funds to be used for Marketing Services - my assumption was that Shumake and his marketing channels got paid from that money.

101. On April 16, 2020, when Petrescu received Jackson's email, more than $20,000 of investor funds was being held in escrow. Over the next several weeks, approximately $20,000 in additional investor money was invested and received into the escrow account.

Answer:
I initiated the disbursements at Jackson's request. Then Jackson had to approve via email the disbursement and then the escrow initiates the ACH/Wire payment.

102. On June 8, 2020, Birch told Petrescu that Shumake had allowed a third party access to non-public information related to Transatlantic Real Estate investors, and instructed Petrescu that, going forward, he should only take direction from Birch. Petrescu responded that, until recently, he understood Shumake to be a representative of Transatlantic Real Estate and Birch's agent.

Answer:
All our conversation pointed in the direction that Shumake was working under Birch orders.

103. Despite these red flags, Petrescu permitted the 420 Real Estate offering to proceed on the TruCrowd platform until it stopped accepting investors in June 2020.

Answer:
Shumake was not a control person. The emails showed me that the issuers has some internal problems. And that they were working to fix them.

104. Petrescu continued to work with Shumake after June 2020. He emailed Shumake about investor complaints. He also networked with Shumake in an effort to arrange a crowdfunding offering by at least one other issuer.

Answer:
I had to try to work with anyone that could somehow start communicating again with the investors and explain to them where they are and what they do.

Shumake introduced me to another reputable person. He was Ambassador in his career and they wanted to raise money too. This introduction took place sometimes before I learned about the internal conflicts within Transatlatic and 420 Real Estate.

139. As described in Paragraphs 75 through 104, above, Defendants Petrescu and TruCrowd

(1) had a reasonable basis for believing that the Transatlantic Real Estate and 420 Real Estate crowdfunding offerings presented the potential for fraud and otherwise raised concerns about investor protection;

Answer: If Shumake was a Control Person, then, yes, I could have seen all the above and problematic.

(2) reasonably believed, or should have reasonably believed, that they were unable to adequately or effectively assess the risk of fraud associated with the Transatlantic Real Estate and 420 Real Estate crowdfunding offerings; and

Answer: If Shumake was a Control Person, then, yes, there was risk of fraud.

> (3) became aware of information, after they had granted access to the TruCrowd crowdfunding platform for the Transatlantic Real Estate and 420 Real Estate crowdfunding offerings, that caused them to reasonably believe, or in the exercise of reasonable care should have caused them to reasonably believe, that the Transatlantic Real Estate and 420 Real Estate crowdfunding offerings presented the potential for fraud and otherwise raised concerns about investor protection.

Answer: Because Shumake was not a Control Person, the above is not a true statement.

Note: The SEC introduced the term "co-manager" as in:

> 43. Shumake co-managed Transatlantic Real Estate with Birch (page 13)
> 67. Shumake co-managed 420 Real Estate with Jackson (page 18)

Because, based on the SEC's own admission, they could not fit Shumake in the Control Person category, so they look to expand the Control Person definition by adding "co-management to it."

I think this is a clear case o f rule making through litigation.