# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

          **Plaintiff,**

          v.

BOBBY SHUMAKE JAPHIA f/k/a
ROBERT SAMUEL SHUMAKE, JR.,
WILLARD L. JACKSON,
NICOLE T. BIRCH,
420 REAL ESTATE, LLC,
VICENT PETRESCU
aka VINCENT PETRESCU, and
TRUCROWD, INC. dba FUNDANNA,

          **Defendants.**

_____/

**Case No.  21-cv-12193**
**Hon.  Matthew F. Leitman**

**JURY TRIAL DEMANDED**

## FIRST AMENDED COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("SEC"),

alleges as follows:

### SUMMARY OF ACTION

1.    The SEC brings this action to remedy two fraudulent crowdfunding

offerings conducted by Defendants Bobby Shumake Japhia f/k/a Robert Samuel

Shumake. Jr. ("Japhia"), Willard L. Jackson ("Jackson"), and Nicole T. Birch

("Birch).

2.     The issuers of the securities that were fraudulently sold to members of the public were Defendant 420 Real Estate, LLC ("420 Real Estate") and a now defunct company named Transatlantic Real Estate, LLC ("Transatlantic Real Estate").

3.     Transatlantic Real Estate and 420 Real Estate raised funds through offerings on a crowdfunding platform hosted by Defendant TruCrowd, Inc. ("TruCrowd").  TruCrowd's CEO, Defendant Vicent Petrescu, aka Vincent Petrescu ("Petrescu"), was responsible for selecting which issuers could use TruCrowd's platform to conduct crowdfunding offerings.  Under the SEC's crowdfunding regulations, Petrescu and TruCrowd served as gatekeepers and, as such, were responsible for taking measures to reduce the risk of fraud.

4.     Japhia and Birch offered and sold securities of Transatlantic Real Estate from September 2018 through May 2019.  Japhia and Jackson offered and sold securities of 420 Real Estate from May 2019 through June 2020.

5.     Japhia was the driving force behind the both offerings, but he kept his participation secret in order to hide a past criminal conviction arising from a mortgage fraud scheme.  Japhia convinced Birch to act as the chief executive officer and sole member of Transatlantic Real Estate and convinced Jackson to act in the same roles for 420 Real Estate.

6.     Japhia, along with Birch and Jackson, marketed both offerings as opportunities for investors to share in bountiful profits from the cannabis industry, by acquiring real estate and leasing it to companies engaged in the business of growing cannabis.

7.     Japhia, Birch, and Jackson made multiple false and misleading representations and omissions to investors in connection with the crowdfunding offerings.  Among other things, they concealed Japhia's past criminal history and his leading role in both offerings.  And to make matters worse, they diverted hundreds of thousands of dollars from the offering proceeds for their personal benefit.  None of the money raised in either offering was used to acquire or improve cannabis real estate.  None of the investors in either crowdfunding offering has received any return on their investment, and few investors have recovered any of the funds they invested.

## **JURISDICTION AND VENUE**

8.     The Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77v(a)], and Sections 21(d) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78u(d) and 78aa(a)].

9.     Venue is proper in this judicial district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15

U.S.C. § 78aa(a)], because many of the acts, transactions and courses of business constituting the violations alleged in this Complaint occurred within the jurisdiction of this district.

10.     In connection with the conduct alleged in this Complaint, the Defendants, directly and indirectly, have made use of the mails and/or means or instrumentalities of transportation or communication in interstate commerce.

## DEFENDANTS

11.     **Bobby Shumake Japhia f/k/a Robert S. Shumake**, age 53, resides in Bloomfield Hills.  In December 2017, Japhia pled guilty to two misdemeanor violations of the Michigan Credit Services Protection Act, and on behalf of his business, to two felony counts of obtaining money by false pretense, for improperly taking upfront fees for mortgage audit services that he promised, but failed to deliver (*People v. Shumake*, et al., Mich. 46th Jud. Dist. (Feb. 15, 2017)). The presiding court sentenced Japhia to a probationary period of 18 months, during which time Japhia was forbidden to work in a position where he could have "direct control over, or access to, another person's money."  Japhia ignored the terms of his probation sentence.  Before his probation ended in May 2019, he conducted the Transatlantic Real Estate offering with Birch and set in motion the 420 Real Estate offering with Jackson.  Japhia owns and controls Shumoja Media Group, LLC ("Shumoja"), a purported marketing services company, which received money in

connection with the crowdfunding offerings. In May 2023 Japhia's legal name was changed, pursuant to a petition filed by Japhia, from Robert Samuel Shumake, Jr. to Bobby Shumake Japhia.

12. **Willard L. Jackson**, age 57, resides in Houston, Texas. Jackson serves as the CEO and the sole director of 420 Real Estate. Jackson previously served as a director of Bangi, Inc., described below. Jackson also held ownership interests in WLJ Group, LLC and Ebony Media Holdings, LLC, (collectively, the "Jackson Entities"). Jackson facilitated the payment of money from the 420 Real Estate offering to the Jackson Entities.

13. **Nicole T. Birch**, age 46, resides in Gainesville, Georgia. Birch is a licensed attorney in Georgia and has her own law practice, H.B. Associates P.C. ("H.B. Associates"). Birch has served as CEO and sole director of both Transatlantic Real Estate and Bangi, Inc. Birch facilitated the payment of money from the Transatlantic Real Estate offering to herself and to H.B. Associates.

14. **420 Real Estate, LLC** is a Texas limited liability company formed in April 2019 with its principal place of business in Houston, Texas. 420 Real Estate purports to be a real estate company that specializes in the acquisition and leasing of properties that support the hemp industry. 420 Real Estate is owned by Willard Jackson. 420 Real Estate raised $888,180 through a crowdfunding offering between May 2019 and June 2020 ("420 Real Estate offering").

15.     **TruCrowd, Inc. dba Fundanna is** a Delaware corporation with its principal place of business in Chicago, Illinois.  TruCrowd is an SEC-registered funding portal for crowdfunding offerings.  TruCrowd hosted the crowdfunding offerings for Transatlantic Real Estate and 420 Real Estate through its platform.

16.     **Vicent Petrescu, aka Vincent Petrescu**, age 49, resides in Algonquin, Illinois.  Petrescu, a licensed CPA, is the founder and CEO of TruCrowd.  Petrescu granted Transatlantic Real Estate and 420 Real Estate access to TruCrowd's platform to conduct the crowdfunding offerings.

## RELATED ENTITIES

17.     **Transatlantic Real Estate, LLC** was a California limited liability company formed in August 2018 with its principal place of business in Grosse Pointe Farms.  Transatlantic Real Estate purported to be a real estate company that specialized in the acquisition and leasing of properties that support the medical cannabis industry.  Transatlantic Real Estate raised $1,020,100 through a crowdfunding offering between September 2018 and May 2019 ("Transatlantic Real Estate offering").  According to the offering statement for the Transatlantic Real Estate offering, Birch was the one hundred percent owner, CEO, chairman, and sole director of the company.  On July 9, 2021, Transatlantic Real Estate filed a Certificate of Cancellation with the California Secretary of State, which terminated its status as a limited liability company.

18.    **Bangi, Inc. ("Bangi")** is a Nevada corporation with its principal place of business in Grosse Pointe Farms.  Bangi is a publicly traded company that purports to specialize in the acquisition and leasing of properties that support the cannabis industry.  Bangi's common stock trades in the over-the-counter market under the symbol "BNGI."  According to Bangi's most recent SEC filing, Birch is the CEO of Bangi.

## FACTS

### Japhia Explores Various Means to Raise Money through Securities Offerings

19.    Following his guilty plea, but before the end of his probationary period and the court order prohibiting him from having access to other people's money, Japhia began taking steps to raise money from the public to enter the cannabis industries.  Ultimately, he pursued crowdfunding offerings as a means to raise funds.

20.    Crowdfunding offerings are governed by the securities transaction registration provisions of the Securities Act [17 U.S.C. §§ 77(a), *et seq.*] and Regulation Crowdfunding thereunder [17 C.F.R. § 227.100, *et seq.*].  From 2018 through 2020—the years relevant to this Complaint—these crowdfunding provisions allowed an unregistered offering of up to $1,070,000 through an intermediary, in this case, a funding portal registered under Rule 400 of Regulation Crowdfunding.  Issuers could offer and sell their securities through the

intermediary's platform on the internet.  Prior to the start of the crowdfunding

offering, the issuer was required to file with the SEC a "Form C," and disclose

certain information about the issuer and the offering through the Form C and

offering statement.  For instance, issuers relying on the crowdfunding registration

exemption were required to disclose, among other information, the names of all the

issuer's officers, directors, and persons occupying a similar status or performing a

similar function; the purpose and intended use of the offering proceeds; related-

party transactions with the issuer's officers and promoters that are, in the

aggregate, in excess of five percent of the aggregate capital that the issuer seeks to

raise; and any material information necessary in order to make the statements made

not misleading, in light of the circumstances under which they were made.

Regulation Crowdfunding also requires that the funding portal post the offering

statement for each issuer on its internet platform so that all prospective investors

have access to the same information relating to the issuer's offering.

21.     In September 2018, Japhia enlisted Birch, an attorney with whom he

was in a personal relationship, to form Transatlantic Real Estate, with Birch

holding the positions of CEO and sole member.  Japhia also convinced Birch to

raise funds through a crowdfunding offering and to hide Japhia's involvement.

22.     Transatlantic Real Estate's mailing address was a UPS store in Grosse

Pointe Farms, near where Japhia lived, rather than in Georgia where Birch lived.

23.    Japhia set up Bangi in November 2018, while he was working with Birch to conduct the Transatlantic Real Estate crowdfunding offering.  Bangi's address at the time was the same UPS store in Grosse Pointe Farms that Transatlantic Real Estate used.

24.    According to its website, Bangi "acquires specialized assets including hemp and cannabis farms, dispensaries, commercial real estate, industrial real estate, and leases real estate to the multi-billion dollar and growing cannabis industry."

25.    Japhia regularly attended and participated in Bangi Board meetings, gave direction to the company's officers and directors, and conducted business on behalf of Bangi.  Board minutes identify Japhia as the founder of Bangi.  Bangi Directors and Japhia discussed his criminal history and its potential impact on prospective investors.  Despite his involvement in the affairs of Bangi, Japhia elected not to serve as an officer or director of the company.  Nor was he listed on Bangi's website.

26.    Japhia explored the possibility of Bangi conducting an offering under SEC Regulation A+ [17 C.F.R. § 230.251, *et seq.*], which permitted higher fundraising amounts than those allowed under Regulation Crowdfunding.  Ultimately, an offering for Bangi never occurred.

27.     In April 2019, Japhia enlisted Jackson, a friend and Bangi director, to form 420 Real Estate, with Jackson as the CEO and sole member.  Japhia convinced Jackson to utilize 420 Real Estate as a vehicle for raising funds through a crowdfunding offering (the "420 Real Estate offering").  Japhia also convinced Jackson to hide Japhia's involvement in the 420 Real Estate offering.

28.     Japhia discussed with Jackson his plans to use money raised through the 420 Real Estate offering to fund Bangi.

29.     Japhia's name was not on any of the offering documents for Transatlantic Real Estate or 420 Real Estate.  Japhia, Jackson, and Birch all knew that the disclosure of Japhia's criminal past could hinder fundraising.  Therefore, they concealed Japhia's involvement, and Birch and Jackson falsely held themselves out as the sole persons with authority over the offerings.

**The Transatlantic Real Estate Offering and Misuse of Investor Proceeds**

30.     Japhia arranged for TruCrowd to serve as the crowdfunding portal for the Transatlantic Real Estate offering.

31.     Birch, with Petrescu's assistance, wrote the Transatlantic Real Estate Form C and offering statement.  Birch and Petrescu kept Japhia informed about the drafting process by copying him on substantive email discussions about the offering statement.  Birch, Japhia, and Petrescu also each weighed in on the steps

necessary to kick off and promote the Transatlantic Real Estate offering to investors.

32.     Transatlantic Real Estate filed the Form C and offering statement with the SEC on September 12, 2018.  Birch signed the Form C as the company's sole officer.

33.     The Form C and offering statement omitted any mention of Japhia's involvement in the company or the offering.  Rather, to conceal Japhia's criminal record, his name did not appear on any of the documents associated with the Transatlantic Real Estate offering.  Birch falsely held herself out as the sole person with authority over the company and the offering.

34.     Japhia and Birch knew that disclosure of Japhia's criminal past could hinder fundraising.

35.     According to the Transatlantic Real Estate offering statement, the company was a diversified investment vehicle that acquired and leased specialized real estate assets.  Its strategy was to acquire industrial real estate that could be used as medical cannabis cultivation facilities.

36.     The Transatlantic Real Estate offering statement represented that the company was offering a maximum of 10,700 convertible notes for $100 each, and that each subscription consisted of a "15% convertible Note . . . that mature[d]

eighteen months from the date of issuance, and, at [the] company's option, [was] convertible at a 10% discount into the public market."

37.    The Transatlantic Real Estate offering statement represented that, after expenses, the company intended to use the offering proceeds as follows: (1) $194,740 for marketing; (2) $97,370 for legal fees; (3) $584,220 for property improvement; and (4) $97,370 in administrative fees.

38.    The Transatlantic Real Estate offering statement contained several materially false and misleading statements, including the following:

  a.  Transatlantic Real Estate employed a senior management team that had significant experience in the real estate industry and sophisticated finance and capital markets expertise;

  b.  Transatlantic Real Estate had contingently acquired a 9-plus acre property with 80,000 Square Foot Green Houses located in California; and

  c.  Transatlantic Real Estate would use $584,220 of the proceeds for "property improvement."

  d.  Transatlantic Real Estate was not a party to any proposed transaction with an officer, director or promoter of which such party would receive in excess of 5% of the aggregate amount of capital Transatlantic Real Estate intended to raise in the offering.

    e.  Transatlantic Real Estate only had one individual who was the company's officer, director, or "person occupying similar status or performing a similar function."

39.    All of these statements were false and misleading.

40.    Transatlantic Real Estate never acquired any real estate and did not use any of the offering proceeds to purchase or improve any property.

41.    As for the management of Transatlantic Real Estate, Birch had no experience in the real estate industry or sophisticated finance and capital markets expertise and did not employ any individuals, let alone a "team" with such experience on behalf of Transatlantic Real Estate.

42.    The offering statement failed to disclose either Japhia's criminal record or that he would be actively involved in raising funds from investors and managing the company.

43.    Japhia co-managed Transatlantic Real Estate with Birch and was extensively involved in the company's strategic decisions.  For instance, Japhia:

    a.  directed communications with current and prospective investors;

    b.  lined up a transfer agent for Transatlantic Real Estate;

    c.  helped prepare documents and promote the offering;

    d.  solicited Transatlantic Real Estate advertisements from third parties and drafted advertising scripts for social media; and

e. gave directions to Birch as to the disbursement of investor money from Transatlantic Real Estate's bank account.

44.    From September 2018 through May 2019, Transatlantic Real Estate raised $1,020,100 from approximately 2,000 investors in multiple states through TruCrowd's platform.  The convertible notes that Transatlantic Real Estate offered and sold to the investing public through TruCrowd were securities.

45.    Birch and Japhia diverted the investors' money for purposes unrelated to Transatlantic Real Estate, including hundreds of thousands of dollars transferred to Birch and her entity, H.B. Associates, and to Japhia and his entity, Shumoja.

46.    Japhia and Birch diverted $358,311–or 35% of the total offering proceeds—to Birch and her firm, H.B. Associates.

47.    Japhia and Birch diverted $304,709—or 30% of the total offering proceeds—to Japhia and his company, Shumoja.

48.    The Transatlantic Real Estate offering statement disclosed the possibility of related party transactions, but stated those transactions would be "consistent with the duties of the management of the Company to its shareholders."

49.    Birch and Japhia did not use any investor funds to buy or improve property.

50.    The Transatlantic Real Estate investors have not received any monetary return on their investment.

- 14 -

**The 420 Real Estate Offering and Misuse of Investor Proceeds**

51.     Japhia arranged for TruCrowd to serve as the crowdfunding portal for

the 420 Real Estate offering and put Jackson in touch with Petrescu.

52.     Jackson knew little about crowdfunding and relied on Japhia to take

the necessary steps for 420 Real Estate to conduct its crowdfunding offering.

Japhia told Jackson, a Bangi Director, about his plan to use the proceeds raised

from the 420 Real Estate offering to fund Bangi.

53.     While Japhia was deeply involved in arranging the offering, he

persuaded Jackson to hide Japhia's role with 420 Real Estate because of his

criminal history.

54.     Petrescu and others participated in the drafting of the 420 Real Estate

Form C and offering statement.  Petrescu and others kept Jackson and Japhia

informed about the drafting process by copying him on substantive email

discussions about the Form C and offering statement.

55.     420 Real Estate filed its Form C and offering statement with the SEC

on May 7, 2019.  Jackson signed the Form C as the company's sole officer.

56.     The 420 Real Estate Form C and offering statement omitted any

mention of Japhia's involvement in the company of the offering.  Rather, to

conceal Japhia's criminal record, his name did not appear on any of the documents

associated with the 420 Real Estate offering.  Jackson falsely held himself out as the sole person with authority over the company and the offering.

57.     Japhia and Jackson knew that disclosure of Japhia's criminal past could hinder fundraising.

58.     According to its offering statement, 420 Real Estate is a diversified investment vehicle that acquires and leases specialized real estate assets.  Its strategy is to acquire industrial real estate that can be used as hemp cultivation facilities.

59.     The 420 Real Estate offering statement represented that the company was offering a maximum of 10,700 convertible notes for $100 each, and that "each subscription consists of a 15% Convertible Note that mature[d] eighteen months from the date of issuance, and at the company's option, [was] convertible at a 10% discount into the public market."

60.     The 420 Real Estate offering statement represented that, after expenses, 420 Real Estate intended to use investor proceeds as follows: (1) $537,450 for marketing; (2) $97,370 for legal fees; (3) $278,960 for property; and (4) $97,370 in administrative fees.

61.     The 420 Real Estate offering statement did not mention Bangi or any intent to use the offering proceeds for Bangi.

62.     Nearly identical to the Transatlantic Real Estate offering statement, the 420 Real Estate offering statement contained several materially false and misleading statements, including the following:

     a.  420 Real Estate's employed a senior management team that has significant experience in all aspects of the real estate industry, including acquisitions, dispositions, leasing, development, management, and finance;

     b.  420 Real Estate would use $278,960 of the proceeds for "property improvement;"

     c.  420 Real Estate was not a party to any proposed transaction with an officer, director or promoter of which such party would receive in excess of 5% of the aggregate amount of capital 420 Real Estate intended to raise in the offering; and

     d.  420 Real Estate only had one individual who was the company's officer, director, or "person occupying similar status or performing a similar function."

63.     All of these statements were false and misleading.

64.     420 Real Estate never used any offering proceeds for "property improvement."

65.     420 Real Estate did not have a senior management team—only Jackson and Japhia.  Jackson had no experience in the real estate industry.  Japhia and Jackson concealed Japhia's criminal record and the fact that Japhia would be actively involved in raising funds from investors and managing the company.

66.     Money received from investors was deposited into an account managed by TruCrowd's escrow agent.  Rather than transferring the offering proceeds from the escrow agent directly to 420 Real Estate, Japhia arranged for the funds to be transferred to an account managed by an attorney he knew.  The attorney was responsible for disbursing the funds and took directions individually from Japhia and Jackson.

67.     Japhia co-managed 420 Real Estate with Jackson and was extensively involved in the company's strategic decisions.  For instance, Japhia:

      a.  directed communications with current and prospective investors;

      b.  helped prepare documents and promote the offering;

      c.  solicited advertisements from third parties and drafted advertising scripts for social media; and

      d.  gave directions to the attorney as to the disbursement of investor moneys.

68.     From May 2019 through June 2020, 420 Real Estate raised approximately $888,180 from the sale of convertible notes to approximately 2,000

investors in multiple states through the TruCrowd platform.  The convertible notes that 420 Real Estate offered and sold to the investing public through TruCrowd were securities.

69.    Pursuant to an agreement, Jackson and Japhia had to give their joint approval for all distributions of funds from the attorney.  In fact, however, Japhia and Jackson each individually directed the attorney to distribute the funds without the approval of the other.

70.    Jackson and Japhia diverted the investors' money for purposes unrelated to 420 Real Estate, including hundreds of thousands of dollars transferred to Japhia, Shumoja, Jackson, and the Jackson Entities.

71.    Japhia and Jackson diverted $280,608—or 32% of the total offering proceeds—to Jackson and the Jackson Entities.

72.    Japhia and Jackson diverted $114,029—or 13% of the total offering proceeds—to Japhia, Shumoja, and Bangi.

73.    Jackson and Japhia did not use any investor funds to buy or improve property.

74.    The 420 Real Estate investors have not received any monetary return on their investment.

## Petrescu and TruCrowd Allowed the Offerings to Proceed Despite Warning Signs of Fraud

75.     Petrescu owned and, as TruCrowd's owner and CEO, controlled the activities of TruCrowd.

76.     Petrescu, acting on behalf of TruCrowd, was responsible for selecting which issuers and individuals could use TruCrowd's platform to conduct crowdfunding offerings.

77.     Petrescu, acting on behalf of TruCrowd, engaged third party escrow agents to hold investor funds.

78.     In exchange for its services in connection with the Transatlantic Real Estate and 420 Real Estate crowdfunding offerings, TruCrowd received $91,679 and $48,412, respectively.

79.     Petrescu, acting on behalf of TruCrowd, assisted issuers and their affiliated individuals with preparing and filing Forms C and offering statements.

80.     Petrescu, acting on behalf of TruCrowd, permitted the Transatlantic Real Estate and 420 Real Estate offerings to proceed despite multiple warning signs of possible fraud or other harm to investors.

81.     Petrescu, acting on behalf of TruCrowd, worked with both Japhia and Birch to file the Transatlantic Real Estate Form C and offering statement.

82.     According to Petrescu, Birch told him that she was the sole officer of Transatlantic Real Estate and that Japhia only provided marketing services. However, Japhia routinely coordinated with Petrescu to address non-marketing matters for the company, such as investor communications and lining up a transfer agent.

83.     Petrescu did not question why the Transatlantic Real Estate offering statement omitted any mention of Japhia's involvement with the company and the offering.

84.     In November 2018, two months after the Transatlantic Real Estate offering opened, Birch forwarded an email to Petrescu from an individual who had provided marketing services to Birch and Japhia in connection with the Transatlantic Real Estate offering.

85.     This individual's email to Birch and Japhia complained that they owed him money for services he had performed on the offering, stated that he had referred Transatlantic Real Estate for collections, and warned them of the potential impact of "SEC, Bad Actor Check."

86.     These emails required action by Petrescu, and through him, by TruCrowd.  Regulation Crowdfunding [17 C.F.R. §§227.301(c)] requires funding portals and their associated persons to conduct a background and securities enforcement regulatory history check (commonly referred to as a "bad actor"

- 21 -

check) on each issuer and the issuer's officers and directors (and any persons performing a similar function) to determine if they are subject to disqualification from participating in crowdfunding under Rule 503 of Regulation Crowdfunding, and to remove an offering from their platform if they become aware of information after they have granted access that causes them to reasonably believe that the issuer or the offering presents the potential for fraud or otherwise raises concerns about investor protection.

87.     Even after receiving this email, Petrescu never requested a bad actor check or ran a background check on Japhia.  If Petrescu had done so, he would have learned of Japhia's criminal history.

88.     A short time later, in December 2018, while the Transatlantic Real Estate offering was still raising funds from investors, Petrescu referred Birch and Japhia to an experienced securities attorney, to explore the possibility of a Regulation A offering for Bangi.

89.     The securities attorney emailed Petrescu on December 14, 2018, after meeting with Japhia and Birch:



**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ >
**Date:** Friday, December 14, 2018 at 5:27 PM
**To:** "Vincent ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** Robert Shumake
Hi Vincent,
I had the call with Robert and Nicole today. Confidentially, they seem to be good at marketing but really have no industry experience. That was a red flag for me. I did a google search and found this about Robert. I am going to pass.
Just wanted to let you know for your information.
https://www.google.com/amp/amp.fox2detroit.com/news/local-news/businessman-robert-shumake-comes-to-court-but-not-alone
▮▮▮▮▮▮▮▮▮▮▮▮
Managing Member

▮▮▮▮▮▮ PLLC

90.     The email linked to a 2017 news article, which discussed the criminal charges filed by the Michigan Attorney General against Japhia and his business Mortgage Auditors of America.  A few hours later, Petrescu replied:



**To:**          ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**From:**     Vincent ▮▮▮▮▮▮▮▮▮▮
**Sent:**      2018-12-14T18:40:27-05:00
**Importance:**        Normal
**Subject:**   Re: Robert Shumake
**Received:**          2018-12-14T18:40:25-05:00

;;;;;
Hi, ▮▮▮
That does not look good.
I need to search some more.
Thanks for sharing!
Best,
V.
**Vincent Petrescu, CPA**
CEO, truCrowd, Inc

91.     The 2017 news article read, in part, as follows:

    a.  "[Michigan Attorney General] Schuette says [Japhia] was behind a scheme to cheat people who were trying to save their homes from Foreclosure."

    b.  "The attorney general's office investigated and recommended a warrant for [Japhia]'s arrest in 2015, but [Japhia] was in Africa."

    c.  "After filing for personal bankruptcy to the tune of more than $3 million, [Japhia] was busy posting on Facebook about his African humanitarian work and even turned up on the Tanzanian TV news as an American investor who ran a railroad."

    d.  "[L]ast year he was caught in California with $121,000 cash in his trunk and large sums of marijuana.  He's got an active arrest warrant in that case."

92.    Despite admitting that he needed "to search some more," Petrescu did not follow up on this red flag.  Instead, Petrescu allowed the Transatlantic Real Estate offering to continue on TruCrowd's platform.

93.    Then, in or about April 2019, Petrescu agreed to work with Japhia again and to host the 420 Real Estate offering on TruCrowd's portal.

94.    Petrescu however, did not request a bad actor check on Japhia or otherwise investigate Japhia's past before agreeing to host the 420 Real Estate offering.

95.     The 420 Real Estate offering statement was nearly identical to the Transatlantic Real Estate offering statement.

96.     Nevertheless, Petrescu did not question the representations in those documents that Jackson was the issuer's sole officer or the omission of any mention of Japhia's involvement with the issuer or the offering.

97.     During and after both the Transatlantic Real Estate offering and the 420 Real Estate offering, Petrescu, and through him TruCrowd, received a series of investor complaints about both the Transatlantic Real Estate and the 420 Real Estate offerings.  Investors asked whether the offerings were scams.  They complained to Petrescu that the issuers were not responding to inquiries.  Some investors complained that they had not received certificates for their investments.  Others asked for the refund of their investments.  All these emails should have raised questions for Petrescu whether the offerings presented the risk of fraud or investor harm, especially in light of the email exchanges described above.

98.     Petrescu's responses to the investor emails was to assure investors that the offerings were not scams, and to represent that he had run bad actor checks.

99.     Petrescu forwarded some of the investor complaints to Japhia, Jackson, and Birch.

100.    On April 16, 2020, Jackson informed Petrescu that Japhia had acted improperly.  Jackson told Petrescu that it is "very disappointing to learn that you

took direction (without my knowledge) from [Japhia] to redirect the approval of funds process for 420 Real Estate crowdfund.  He is not a party to my agreement with you or [TruCrowd]."  In a response on the same day copying Petrescu, Japhia stated that the 420 Real Estate offering was designed to support Bangi, Jackson's business, Ebony, and the "263k used by me to seed the operation."  Yet, this email did not prompt Petrescu to question why Bangi, Ebony, and payments to Japhia were omitted from the 420 Real Estate Form C and offering statement.

101.   On April 16, 2020, when Petrescu received Jackson's email, more than $20,000 of investor funds was being held in escrow.  Over the next several weeks, approximately $20,000 in additional investor money was invested and received into the escrow account.

102.   On June 8, 2020, Birch told Petrescu that Japhia had allowed a third party access to non-public information related to Transatlantic Real Estate investors, and instructed Petrescu that, going forward, he should only take direction from Birch.  Petrescu responded that, until recently, he understood Japhia to be a representative of Transatlantic Real Estate and Birch's agent.

103.   Despite these red flags, Petrescu permitted the 420 Real Estate offering to proceed on the TruCrowd platform until it stopped accepting investors in June 2020.

104.   Petrescu continued to work with Japhia after June 2020.  He emailed Japhia about investor complaints.  He also networked with Japhia in an effort to arrange a crowdfunding offering by at least one other issuer.

## COUNT I
### Violations of Section 17(a) of the Securities Act
### [15 U.S.C. § 77q(a)]
### (Japhia, Jackson, Birch and 420 Real Estate)

105.   Paragraphs 1 through 104 are realleged and incorporated by reference as though fully set forth herein.

106.   By engaging in the conduct described above, Defendants Japhia, Jackson, Birch, and 420 Real Estate, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have employed devices, schemes and artifices to defraud; obtained money and property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

107.   Defendants Japhia, Jackson, Birch, and 420 Real Estate acted knowingly, recklessly, and/or negligently, in engaging in the conduct described above.

- 27 -

108.   By engaging in the conduct described above, Defendants Japhia,

Jackson, Birch, and 420 Real Estate violated Section 17(a) of the Securities Act

[15 U.S.C. § 77q(a)].

## COUNT II
### Violations of Section 10(b) of the Exchange Act
### and Exchange Act Rule 10b-5
### [15 U.S.C. § 78j(b) and 17 C.F.R. 240.10b-5]
### (Japhia, Jackson, Birch and 420 Real Estate)

109.   Paragraphs 1 through 104 are realleged and incorporated by reference.

110.   By engaging in the conduct described above, Defendants Japhia,

Jackson, Birch, and 420 Real Estate, in connection with the purchase and sale of

securities, by the use of the means and instrumentalities of interstate commerce and

by the use of the mails, directly and indirectly, employed devices, schemes and

artifices to defraud; made untrue statements of material fact and omitted to state

material facts necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading; and engaged in acts,

practices and courses of business which operated or would have operated as a fraud

and deceit upon purchasers and sellers and prospective purchasers and sellers of

securities.

111.   Defendants Japhia, Jackson, Birch, and 420 Real Estate acted knowingly and/or recklessly, in engaging in the fraudulent conduct described above.

112.   Through the foregoing, Defendants Japhia, Jackson, Birch, and 420 Real Estate violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

**COUNT III**
**Violations of Section 5(a) and (c) of the Securities Act**
**[15 U.S.C. § 77e(a) and (c)]**
**<u>(Japhia and Birch as to Transatlantic Real Estate)</u>**

113.   Paragraphs 1 through 104 are realleged and incorporated by reference.

114.   From in or about September 2018 through in or about June 2019, Defendants Japhia and Birch directly or indirectly, as to securities of Transatlantic Real Estate: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of a prospectus or otherwise; or carried securities or caused such securities to be carried through the mails or in interstate commerce, by means or instruments of transportation, for the purpose of sale or delivery after sale; and (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or to offer to buy, through the

use or medium of any prospectus or otherwise, securities without a registration statement having been filed with the SEC or being in effect as to such securities.

115.   No registration statements were filed with the SEC or were in effect in connection with offers or sales of securities of Transatlantic Real Estate by Defendants Japhia and Birch, and no exemption from the registration requirements applied to Defendant Japhia's and Birch's sales.

116.   By engaging in the conduct described above, Defendants Japhia and Birch violated, and unless restrained and enjoined are reasonably likely to continue to violate Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

**COUNT IV**
**Violations of Section 5(a) and (c) of the Securities Act**
**[15 U.S.C. § 77e(a) and (c)]**
**(Japhia, Jackson and 420 Real Estate)**

117.   Paragraphs 1 through 104 are realleged and incorporated by reference.

118.   From in or about July 2019 through in or about June 2020, Defendants Japhia, Jackson and 420 Real Estate, directly or indirectly, as to securities of Defendant 420 Real Estate: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of a prospectus or otherwise; or carried securities or caused such securities to be carried through the mails or in interstate commerce, by means or instruments of transportation, for the purpose of sale or

- 30 -

delivery after sale; and (b) made use of the means or instruments of transportation

or communication in interstate commerce or of the mails to offer to sell or to offer

to buy, through the use or medium of any prospectus or otherwise, securities

without a registration statement having been filed with the SEC or being in effect

as to such securities.

119.   No registration statements were filed with the SEC or were in effect in

connection with offers or sales of securities of Defendant 420 Real Estate by

Defendants Japhia, Jackson or 420 Real Estate, and no exemption from the

registration requirements applied to the sales by Defendant Japhia, Jackson, and

420 Real Estate.

120.   By engaging in the conduct described above, Defendants Japhia,

Jackson, and 420 Real Estate violated, and unless restrained and enjoined are

reasonably likely to continue to violate Sections 5(a) and (c) of the Securities Act

[15 U.S.C. §§ 77e(a) and (c)].

**COUNT V**
**Aiding and Abetting Violations of**
**Section 17(a) of the Securities Act**
**[15 U.S.C. § 77q(a)]**
**<u>(Japhia)</u>**

121.   Paragraphs 1 through 104  are realleged and incorporated by

reference.

122.   As described above, Defendants Jackson and Birch, in the offer and sale of securities, respectfully, of 420 Real Estate and Transatlantic Real Estate, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have employed devices, schemes and artifices to defraud; obtained money and property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

123.   By engaging in the conduct described, Defendants Jackson and Birch violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

124.    Defendant Japhia knowingly and/or recklessly provided substantial assistance to Defendants Jackson and Birch.

125.   By reason of the foregoing, Defendant Japhia aided and abetted the violations of Section 17(a) of the Securities Act, by Defendants Jackson and Birch and, pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Defendant Japhia is liable to the same extent as Defendants Jackson and Birch for their violations of Section 17(a) of the Securities Act.

**COUNT VI**
**Aiding and Abetting Violations of**

**Section 10(b) of the Exchange Act**
**and Exchange Act Rule 10b-5**
**[15 U.S.C. § 78j(b) and 17 C.F.R. 240.10b-5]**
**(Japhia)**

126.   Paragraphs 1 through 104 are realleged and incorporated by reference.

127.   As described above, Defendants Jackson and Birch in connection with the purchase and sale of securities, respectfully, of 420 Real Estate and Transatlantic Real Estate, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and sellers and prospective purchasers and sellers of securities.

128.   By engaging in the conduct described, Defendants Jackson and Birch violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

129.   Defendant Japhia knowingly and/or recklessly provided substantial assistance to Defendants Jackson and Birch.

130.   By reason of the foregoing, Defendant Japhia aided and abetted the violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by

Defendants Jackson and Birch and, pursuant to Section 20(e) of the Exchange Act

[15 U.S.C. § 78t(e)], Defendant Japhia is liable to the same extent as Defendants

Jackson and Birch for their violations of Sections 10(b) of the Exchange Act and

Rule 10b-5 thereunder.

## COUNT VII
### Aiding and Abetting Violations of
### Sections 5(a) and (c) of the Securities Act
### [15 U.S.C. §§ 77e(a) and (c)]
### (Japhia)

131.   Paragraphs 1 through 104 are realleged and incorporated by reference.

132.   As described, Defendants Jackson and Birch offered and sold

securities of, respectfully, 420 Real Estate and Transatlantic Real Estate, when no

registration statements were filed with the SEC or were in effect in connection with

offers or sales of securities of either issuer, and no exemption from the registration

requirements applied to Defendants' sales.

133.   By engaging in the conduct described, Defendants Jackson and Birch

violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

134.   Defendant Japhia knowingly and/or recklessly provided substantial

assistance to the unregistered offers and sales by Defendants Jackson and Birch.

135.   By reason of the foregoing, Defendant Japhia aided and abetted the

violations of Section 5(a) and 5(c) of the Securities Act, by Defendants Jackson

and Birch and, pursuant to Section 15(b) of the Securities Act [15 U.S.C. §

77o(b)], Defendant Japhia is liable to the same extent as Defendants Jackson and

Birch for their violations of Sections 5(a) and (c) of the Securities Act.

### COUNT VIII
### Violations of Section 4A(a)(5) of the Securities Act and
### Rules 301(c)(2) Thereunder
### [15 U.S.C. § 77d–1(a)(5) and 17 C.F.R. 17 C.F.R. § 227.301(c)(2)]
### <u>(Petrescu and TruCrowd)</u>

136.   Paragraphs 1 through 104 are realleged and incorporated by reference.

137.   In connection with the Transatlantic Real Estate and 420 Real Estate

crowdfunding offerings, Defendant TruCrowd was an intermediary, and Petrescu

was an associated person of an intermediary, for purposes of Section 4A of the

Securities Act [15 U.S.C. § 77d–1]  and Rules 300(c)(1) and 300(c)(3) thereunder

[17 C.F.R. §§ 227.300(c)(1) and 227.300(c)(3)].

138.   As described above, Defendants Petrescu and TruCrowd allowed

Defendants access to TruCrowd's crowdfunding platform in connection with the

Transatlantic Real Estate and 420 Real Estate crowdfunding offerings.

139.   As described in Paragraphs 75 through 104, above, Defendants

Petrescu and TruCrowd (1) had a reasonable basis for believing that the

Transatlantic Real Estate and 420 Real Estate crowdfunding offerings presented

the potential for fraud and otherwise raised concerns about investor protection; (2)

reasonably believed, or should have reasonably believed, that they were unable to

adequately or effectively assess the risk of fraud associated with the Transatlantic

Real Estate and 420 Real Estate crowdfunding offerings; and (3) became aware of information, after they had granted access to the TruCrowd crowdfunding platform for the Transatlantic Real Estate and 420 Real Estate crowdfunding offerings, that caused them to reasonably believe, or in the exercise of reasonable care should have caused them to reasonably believe, that the Transatlantic Real Estate and 420 Real Estate crowdfunding offerings presented the potential for fraud and otherwise raised concerns about investor protection.

140.   As described above, Defendants Petrescu and TruCrowd failed to deny access to TruCrowd's crowdfunding platform and failed to promptly remove the Transatlantic Real Estate and 420 Real Estate offerings from TruCrowd's crowdfunding platform, cancel the offerings, and return and direct the return of any funds that had been committed by investors in the offerings.

141.   By reason of the foregoing, Defendants TruCrowd and Petrescu have violated, and unless restrained and enjoined are reasonably likely to continue to violate, Section 4A(a)(5) of the Securities Act [15 U.S.C. § 77d–1(a)(5)] and Rule 301(c)(2) thereunder [17 C.F.R. § 227.301(c)(2)].

## **RELIEF REQUESTED**

**THEREFORE,** the SEC requests that this Court:

### **I.**

Permanently enjoin Defendants Japhia, Jackson, Birch, and 420 Real Estate,

their officers, agents, servants, employees, attorneys and those persons in active concert or participation with Defendants who receive actual notice of the order of this Court, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 CFR § 240.10b-5]; and Section 5 of the Securities Act [15 U.S.C. § 77e];

## II.

Permanently enjoin Defendants Petrescu and TruCrowd, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with Defendants who receive actual notice of the order of this Court, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 4A of the Securities Act [15 U.S.C. § 77d–1] and Rules 300(c)(1) and 300(c)(3) thereunder [17 C.F.R. §§ 227.300(c)(1) and 227.300(c)(3)];

## III.

Ordering Defendants to disgorge all ill-gotten gains and/or unjust enrichment received directly or indirectly, with pre-judgment interest thereon, as a

result of the alleged violations, pursuant to Exchange Act Sections 21(d)(5) and

21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)];

## IV.

Order Defendants to pay civil penalties pursuant to Section 20(d) of the

Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15

U.S.C. § 78u(d)(3)];

## V.

Enter an Order, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C.

§ 78u(d)(2)] permanently prohibiting Defendants Japhia, Jackson, and Birch from

serving as an officer or director of any issuer that has a class of securities

registered pursuant to Section 12 [15 U.S.C. § 78l] of the Exchange Act or that is

required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. §

78o(d)]; and

## VI.

Grant any other relief this Court deems appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Dated: June 21, 2024                Respectfully Submitted,

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**

*s/John E. Birkenheier*
John E. Birkenheier, Illinois Bar No. 6270993
Jerrold H. Kohn, Illinois Bar No. 6188085
Dante A. Roldàn, Illinois Bar No. 6316972

U.S. Securities and Exchange Commission
Chicago Regional Office
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
(312) 353-7390
(312) 353-7398 (facsimile)
BirkenheierJ@sec.gov
KohnJ@sec.gov
RoldanD@sec.gov

Dawn N. Ison, United States Attorney
Kevin Erskine (P69120), Assistant United States
Attorney
211 W. Fort Street, Ste. 2001
Detroit, MI 48226
Tel: (313) 226-9610
Email: Kevin.Erskine@usdoj.gov

*Attorneys for Plaintiff*