# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,**

**Plaintiff,**

**v.**

**BOBBY SHUMAKE JAPHIA,**

**Defendant.**

_____/

**Case No. 2:21-cv-12193**

**Hon. Matthew F. Leitman**

## MOTION OF PLAINTIFF U.S. SECURITIES AND EXCHANGE COMMISSION FOR SUMMARY JUDGMENT AGAINST DEFENDANT BOBBY SHUMAKE JAPHIA

Plaintiff U.S. Securities and Exchange Commission ("SEC"), pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, respectfully moves for entry of summary judgment on liability[1] against Defendant Bobby Shumake Japhia ("Japhia").

This case arises from a securities fraud scheme orchestrated by Japhia that used two crowdfunding offerings to raise money from vulnerable everyday investors. Approximately 1,850 people invested in the first offering and about 2,000 invested in the second offering. The victims invested amounts as small as

---

[1] The SEC will file a motion for imposition of remedies against Japhia if the Court grants summary judgment against him.

$100. The offerings promised investors that the proceeds from the offerings would be used to generate profit through buying and improving real estate used in the cannabis and hemp business.

Japhia is a convicted criminal who invoked the Fifth Amendment during his deposition and never responded to the SEC's Rule 36 Requests for Admission. To conceal his involvement in the at-issue securities offerings and facilitate his theft of investor funds, Japhia designated his associates as figureheads acting as the purported managers of the offerings. Japhia instructed his associates on how to structure the offerings, what lies to tell investors to get the investors' money, and how to disburse stolen funds, including disbursements to Japhia, Japhia's family members, and Japhia's associates. The truth was that Japhia controlled both offerings. None of the proceeds from the offerings were spent to buy real estate, improve real estate, or generate profits. The thousands of victims invested more than $1.9 million, and virtually all of their money is gone.

The undisputed material facts in this case demonstrate that the SEC is entitled to summary judgment as to liability on its claims that Japhia violated the antifraud and securities registration provisions of the federal securities laws. Indeed, Japhia removed many of the issues in this case from any dispute when he made binding judicial admissions through his failure to respond to the SEC's Rule 36 Requests for Admission.

The evidence shows beyond genuine dispute that Japhia,[2] as a matter of law:

1.      Violated Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1) and (3)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)] by knowingly or recklessly engaging in a scheme to conceal his involvement with the two crowdfunding offerings at issue in this case and to misappropriate the proceeds from those offerings (Counts I and II);[3]

2.      Violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)] by, while acting at least negligently, obtaining money by means of materially false and misleading statements in the relevant crowdfunding offerings (Count I);

3.      Violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)] by engaging in unregistered securities offerings (Counts III and IV); and

4.      Aided and abetted violations of Sections 17(a) of the Securities Act,

---

[2] The other defendants in this matter were Vicent Petrescu, TruCrowd, Inc., Nicole Birch, Willard Jackson, and 420 Real Estate, LLC. Each of these defendants consented to final judgments that included permanent injunctions from violations of the antifraud and registration provisions of the federal securities laws, and monetary relief (ECF Nos. 20-22, 30-31). The SEC did not name the other offeror, Transatlantic Real Estate, LLC, which was dissolved in July 2021, as a defendant.

[3] In June 2023, the Court dismissed the SEC's claims brought against Japhia under Exchange Act Rule 10b-5(b). *See* ECF No. 36.

Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Sections 5(a) and 5(c) of the Securities Act (Counts V, VI, and VII).

In support of its Motion for Summary Judgment, the SEC relies on: (1) its brief in support; (2) transcript excerpts of, and selected exhibits from, sworn investigative testimony and/or depositions of Defendant Japhia, Joshua Griggs, Douglas Hampton, Willard Jackson, Roland Martin, Natalie King, Neil Parsan, Waleed Shamsid-Deen, Amina Shumake, and Diop Shumake; (3) declarations of Ann Tushaus, Richard Shykora, John Welty, and Jason Wilson, with accompanying exhibits; (4) various additional exhibits; and (5) the pleadings previously filed; and (6) all prior proceedings in this action.[4]

---

[4] Copies of the SEC's Rule 36 Requests and the transcript of Japhia's testimony are being filed as exhibits to this brief.

Pursuant to Local Rule of Civil Procedure 7.1, counsel sought concurrence in this motion, but Defendant Japhia did not concur.[5]

Dated:  July 28, 2025          Respectfully submitted,

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**

*s/BeLinda Mathie*
BeLinda Mathie, Illinois Bar No. 6275461
Benjamin Hanauer, Illinois Bar No. 6280156
Jerrold H. Kohn, Illinois Bar No. 6188085
U.S. Securities and Exchange Commission
Chicago Regional Office
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
(312) 353-7390
(312) 353-7398 (facsimile)
MathieB@sec.gov
HanauerB@sec.gov
KohnJ@sec.gov

Julie A. Beck, Acting United States Attorney
Kevin Erskine (P69120), Ass't U.S. Attorney
211 W. Fort Street, Ste. 2001
Detroit, MI 48226
Tel: (313) 226-9610
Email: Kevin.Erskine@usdoj.gov
*Attorneys for Plaintiff*

---

[5] On October 8, 2024, a grand jury in the District of Columbia indicted Japhia on one count of securities fraud and one count of obstruction arising from the manipulation of the stock of a microcap issuer named Minerco, Inc. *United States v. Bobby Shumake Japhia*, 1:24-cr-00450 (D.D.C.). The SEC simultaneously filed a civil enforcement action against Japhia alleging securities fraud in connection with the Minerco manipulation scheme. *SEC v. Minerco, Inc., Bobby Shumake Japhia, and Julius Makiri Jenge*, No. 1:24-cv-02870 (D.D.C.). The alleged Minerco manipulation scheme is unrelated to the transactions and events at issue in this SEC action.

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,**

        **Plaintiff,**

        **v.**

**BOBBY SHUMAKE,**

        **Defendant.**

_____/

**Case No.  2:21-cv-12193**

**Hon. Matthew F. Leitman**

## PLAINTIFF U.S. SECURITIES AND EXCHANGE COMMISSION'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT <u>AGAINST DEFENDANT BOBBY SHUMAKE JAPHIA</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................... ii

ISSUES PRESENTED.............................................................vi

CONTROLLING OR MOST APPROPRIATE AUTHORITY ............................ vii

FACTS .............................................................................1

   I.     Background ................................................................ 1

   II.    The Crowdfunding Offerings...................................... 3

        A. The TRE Offering and Misappropriation of Investor Funds.................4

        B. The 420 Offering and Misappropriation of Investor Funds .................7

   III.   Japhia Asserted His Fifth Amendment Privileges ....................................12

ARGUMENT .......................................................................13

   I.     Summary Judgment Standard................................................. 13

   II.    Japhia Violated the Federal Securities Laws ........................................... 14

        A. The TRE and 420 Notes Were Securities .......................................... 14

        B. Japhia Directed a Scheme to Conceal His Involvement with the TRE and 420 Offerings and Misappropriate the Proceeds (Counts I and II) ........................................................16

        C. Japhia Negligently Received Money by Means of False and Misleading Statements of Material Fact (Count I) ........................20

        D. Japhia Violated Securities Act Section 5 (Counts III and IV)..............21

        E. Japhia Aided and Abetted the Other Defendants' Violations (Counts V, VI, and VII)...........................................................23

CONCLUSION .....................................................................25

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                                          **Page(s)**

*Aaron v. SEC*,
    446 U.S. 680 (1980) ......................................................................... 17, 20

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ....................................................................... 13

*Baxter v. Palmigiano*,
    425 U.S. 308 (1976) ....................................................................... 13

*Kerry Steel, Inc. v. Paragon Indus.*,
    106 F.3d 147 (6th Cir. 1997) ................................................................1

*La Grasso Bros. Inc. v. Am. Foodservice, L.L.C.*, No. 10-10711,
    2011 WL 891221 (E.D. Mich. Mar. 11, 2011) .....................................................1

*Lorenzo v. SEC*,
    139 S. Ct. 1094 (2019) ..................................................................... 17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ....................................................................... 13

*McMurry v. Dunnigan*, No. 1:20-cv-847,
    2023 WL 11200078 (W.D. Mich. Sept. 18, 2023) ............................................. 1

*In re Pacific Thomas Corp.*,
    715 F. App'x 778 (9th Cir. 2018) ........................................................ 1

*Reves v. Ernst & Young*,
    494 U.S. 56 (1990) ..................................................................... 15-16

*SEC v. Art Intellect, Inc.*, No. 2:11-CV-357,
    2013 WL 840048 (D. Utah Mar. 6, 2013) ...................................................... 14

*SEC v. Asset Recovery and Mgmt. Trust, S.A.*, No. 2:02-CV-1372-WKW,
    2008 WL 4831738 (M.D. Ala. Nov. 3, 2008) .................................................. 14

*SEC v. Battenberg*, No. 06-14891,
    2010 WL 1416981 (E.D. Mich. Apr. 8, 2010) ........................................... 18-19

*SEC v. Battenberg*, No. 06-14891,
    2011 WL 3472619 (E.D. Mich. Aug. 9, 2011) ................................................ 23

*SEC v. Blavin*,
    760 F.2d 706 (6th Cir. 1985) ............................................................ 17

*SEC v. Bongiorno*, No. 1:20-cv-00469,
    2021 WL 5866991 (N.D. Ohio Dec. 10, 2021) ................................. 18

*SEC v. Bongiorno*, No. 1:20-cv-00469,
    2023 WL 2865625 (N.D. Ohio Apr. 10, 2023) ................................. 14

*SEC v. Bravata*,
    3 F. Supp. 3d 638 (E.D. Mich. 2014) ............................................... 21

*SEC v. Coffey*,
    493 F.2d 1304 (6th Cir. 1974) .......................................................... 23

*SEC v. Global Telecom Servs. LLC*,
    325 F. Supp. 2d 94 (D. Conn. 2004) ................................................ 14

*SEC v. Lyttle*,
    538 F.3d 601 (7th Cir. 2008) ............................................................ 14

*SEC v. Monterosso*,
    768 F. Supp. 2d 1244 (S.D. Fla. 2011), *aff'd*, 756 F.3d 1326
    (11th Cir. 2014) ................................................................................ 14

*SEC v. Onyx Capital Advisors, LLC*, No. 10-11633,
    2012 WL 4849890 (E.D. Mich. Oct. 11, 2012) ........................... 13-14

*SEC v. Prof'l Assocs.*,
    731 F.2d 349 (6th Cir. 1984) ...................................................... 14-15

*SEC v. Suman*,
    684 F. Supp. 2d 378 (S.D.N.Y. 2010) ............................................. 14

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946) .................................................................... 14-15

*SEC v. Zada*, No. 10-CV-14498,
    2013 WL 3945993 (E.D. Mich. July 31, 2013), *aff'd*,
    787 F.3d 375 (6th Cir. 2015) ........................................... 14, 15-16, 19

*SEC v. Zandford*,
    535 U.S. 813 (2002) ......................................................................... 18

iii

*Teamsters Local 237 Welfare Fund v. ServiceMaster Global Holdings, Inc.*,
    83 F.4th 514 (6th Cir. 2023) ............................................................. 17

*Turk v. CitiMortgage*, No. 05-70386,
    2005 WL 2090888 (E.D. Mich. Aug. 29, 2005) ..................................... 1

*United States ex rel. Bilokumsky v. Tod*,
    263 U.S. 149 (1923) ...................................................................... 14

*United States v. Searan*,
    259 F.3d 434 (6th Cir. 2001) ....................................................... 23-24

**Federal Statutes**

15 U.S.C. § 77c(a)(11), Securities Act of 1933 Section 3(a)(11) .......................... 22

15 U.S.C. § 77d(a)(1), Securities Act of 1933 Section 4(a)(1) ............................. 22

15 U.S.C. § 77d(a)(2), Securities Act of 1933 Section 4(a)(2) ............................. 22

15 U.S.C. § 77d(a)(6), Securities Act of 1933 Section 4(a)(6) ............................... 3

15 U.S.C. § 77d-1(b), Securities Act of 1933 Section 4A(b) ............................... 21

15 U.S.C. § 77o(b), Securities Act of 1933 Section 15(b) .....................................23

15 U.S.C. § 77q(a), Securities Act of 1933 Section 17(a) ....................................24

15 U.S.C. § 77q(a)(1), Securities Act of 1933 Section 17(a)(1) ...............17, 18, 19

15 U.S.C. § 77q(a)(2), Securities Act of 1933 Section 17(a)(2) ...........................20

15 U.S.C. § 77q(a)(3), Securities Act of 1933 Section 17(a)(3) ....................17, 19

15 U.S.C. § 78t(e), Securities Act of 1933 Section 20(e) .....................................23

15 U.S.C. § 78j(b), Securities Exchange Act of 1934 Section 10(b) ....17, 18, 19, 24

**Rules**

17 C.F.R. Part 227 (Regulation CF) ...................................................................... 4

17 C.F.R. § 227.100, Rule 100 under the Securities Act of 1933 ........................... 3

17 C.F.R. § 227.100(a)(1), Rule 100(a)(1) under the Securities Act of 1933 .......... 3

17 C.F.R. § 227.201, Rule 201 under the Securities Act of 1933 ......................... 21

17 C.F.R. § 227.203, Rule 203 under the Securities Act of 1933 ........................... 3

17 C.F.R. § 230.147, Rule 147 under the Securities Act of 1933 ......................... 22

17 C.F.R. § 230.147A, Rule 147A under the Securities Act of 1933 ................... 22

17 C.F.R. § 230.504, Rule 504 under the Securities Act of 1933 ......................... 22

17 C.F.R. § 230.506(b), Rule 506(b) under the Securities Act of 1933 ................ 22

17 C.F.R. § 230.506(c), Rule 506(c) under the Securities Act of 1933   .............. 22

17 C.F.R. § 240.10b-5(a), Rule 10b-5(a) under the Securities
    Exchange Act of 1934.................................................................................*passim*

17 C.F.R. § 240.10b-5(c), Rule 10b-5(c) under the Securities
    Exchange Act of 1934.................................................................................*passim*

82 Fed. Reg. 17545 (Apr. 12, 2017) .........................................................................3

Fed. R. Civ. P. 36(a)(3) ...........................................................................................1

Fed. R. Civ. P. 56(a)............................................................................................. 13

**State Statutes**

Mich. Comp. Laws § 445.1825 (1994) .................................................................. 1-2

Mich. Comp. Laws § 750.218(4)(a) (1994) ......................................................... 1-2

## ISSUES PRESENTED

1.      Whether Bobby Shumake Japhia violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder, based on the undisputed material facts (Count II)?

2.      Whether Bobby Shumake Japhia violated Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, based on the undisputed material facts (Count I)?

3.      Whether Bobby Shumake Japhia violated Sections 5(a) and 5(c) of the Securities Act, based on the undisputed material facts (Counts III & IV)?

4.      Whether Bobby Shumake Japhia aided and abetted violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Sections 5(a) and 5(c) of the Securities Act, based on the undisputed material facts (Counts V, VI, & VII)?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

1.      Fed. R. Civ. P. 56(a)

2.      *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019)

3.      *SEC v. Zandford*, 535 U.S. 813 (2002)

4.      *Aaron v. SEC*, 446 U.S. 680 (1980)

5.      *Baxter v. Palmigiano*, 425 U.S. 308 (1976)

6.      *SEC v. Coffey*, 493 F.2d 1304 (6th Cir. 1974)

7.      *SEC v. Prof'l Assocs.*, 731 F.2d 349 (6th Cir. 1984)

8.      *La Grasso Bros. Inc. v. Am. Foodservice, L.L.C.*, No. 10-10711, 2011 WL 891221, at *3 (E.D. Mich. Mar. 11, 2011)

9.      *SEC v. Onyx Capital Advisors, LLC*, No. 10-11633, 2012 WL 4849890, at *3 (E.D. Mich. Oct. 11, 2012)

10.     *SEC v. Zada*, No. 10-CV-14498, 2013 WL 3945993, at *4 (E.D. Mich. July 31, 2013), *aff'd*, 787 F.3d 375 (6th Cir. 2015)

11.     *SEC v. Bravata*, 3 F. Supp. 3d 638, 659 (E.D. Mich. 2014)

12.     *Turk v. CitiMortgage*, No. 05-70386, 2005 WL 2090888, at *3 (E.D. Mich. Aug. 29, 2005)

## FACTS

The facts in this brief are supported by testimony taken during the SEC's investigation, deposition testimony, declarations, and selected exhibits thereto.[1] Certain facts concerning Japhia are established by his failure to respond to the SEC's Requests for Admission[2] and adverse inferences drawn from Japhia's invocation of his Fifth Amendment rights during his deposition in this case.

## I.   BACKGROUND

Japhia is a convicted criminal. In December 2017, Japhia pleaded guilty to two misdemeanor violations of the Michigan Credit Services Protection Act (Mich. Comp. Laws § 445.1825). (Ex. 9, RFA 1; Ex. 24, Judgment of Sentence.) At the same time, a company controlled by Japhia pleaded guilty to two felony counts of

---

[1] The SEC is filing the complete transcripts of Japhia's investigative testimony and deposition. Upon the Court's request, the SEC will provide complete copies of any other transcripts.

[2] The SEC served Japhia with Requests for Admission on July 9, 2024. (Ex. 10, Tushaus Decl. ¶ 46.) Japhia failed to respond. (*Id.*) Therefore, the facts stated in each request are admitted. Fed. R. Civ. P. 36(a)(3); *La Grasso Bros. Inc. v. Am. Foodservice, L.L.C.*, No. 10-10711, 2011 WL 891221, at *3 (E.D. Mich. Mar. 11, 2011) (citing *Kerry Steel, Inc. v. Paragon Indus.*, 106 F.3d 147, 153 (6th Cir. 1997)). Furthermore, "Rule 36 is self-executing, meaning that a party admits a matter by failing to serve a response to the request within thirty days; the opposing party does not have to file a motion to deem the matter admitted." *McMurry v. Dunnigan*, No. 1:20-cv-847, 2023 WL 11200078, at *2 (W.D. Mich. Sept. 18, 2023) (quoting *In re Pacific Thomas Corp.*, 715 F. App'x 778, 779 (9th Cir. 2018)). Matters deemed admitted pursuant to Rule 36(a) can serve as the basis for granting a motion for summary judgment. *Turk v. CitiMortgage*, No. 05-70386, 2005 WL 2090888, at *3 (E.D. Mich. Aug. 29, 2005).

Obtaining Money by False Pretenses Over $1,000 (Mich. Comp. Laws

§ 750.218(4)(a)) and thirteen misdemeanor violations of the Credit Services

Protection Act (Mich. Comp. Laws § 445.1825). (Ex. 9, RFA 2, 3; Ex. 24

Judgment of Sentence.)

Prior to his convictions, in approximately 2017, Japhia began making claims

to his associates that he was going to generate profits by starting a cannabis

business. (Ex. 11, Jackson Test. 26:13-27:7; 32:19-33:15.) Japhia began by

arranging in 2017 for Louis Armstrong & Associates ("LAA"), a partnership of

which he was a member, to lease and operate a cannabis farm in California, with

an option to buy the farm. (Ex. 5, Wilson Decl. ¶¶ 3-4 & Ex. A.)

In November 2018, Japhia acquired Bangi, Inc. ("Bangi"). (Ex. 8, Shykora

Decl. ¶¶ 3-5.) Japhia controlled Bangi. (Ex. 9, RFA 13.) Despite his control of

Bangi, Japhia did not serve as an officer or director of the company. (Ex. 11,

Jackson Test. 39:15-41:15, 116:24-118:21.)

Japhia aimed for Bangi to conduct a public offering of up to $50 million of

Bangi promissory notes. (Ex. 4, Bangi Prelim. Offering Circular, 3; Ex. 8, Shykora

Decl. ¶¶ 5, 12, 14 & Exs. F, G; Ex. 11, Jackson Test. 32:19-33:15, 34:13-22.)

Japhia's goal was to use the money to acquire the cannabis farm. (Ex. 11, Jackson

Test. 26:14-27:20, 34:22, 44:8-45:7.)

But Japhia's efforts to raise money through Bangi failed. (Ex. 12, Parsan Test. 40:20-25; Ex. 13, Bangi Withdrawal of Form 1-A.) A major obstacle in raising money from the public was Japhia's criminal background. Minutes for a January 11, 2019 meeting of Bangi's Board of Directors identify Japhia as the founder of Bangi and attending the meeting. (Ex. 9, RFA 11; Ex. 26, Bangi Board Minutes at 1.) One topic discussed at the meeting was how and whether to disclose Japhia's criminal record, which the meeting minutes referred to as "challenges:"

> Robert Shumake Challenges and how to address?
> - Should we let investors know about his challenges upfront or later after acquiring assets?
> - Disclosing the challenges of the owner of the property/ asset? After the Asset or before?
> - How do we disclose all challenges to SEC?

## II.    THE CROWDFUNDING OFFERINGS

In 2018 and 2019, Japhia turned to a new option to raise money for his purported cannabis business--crowdfunding[3] offerings by two newly-organized companies, Transatlantic Real Estate, LLC ("TRE") (the "TRE Offering") and 420

---

[3] Crowdfunding offerings are governed by the securities transaction registration provisions of the Securities Act and Regulation Crowdfunding ("Regulation CF"). *See* 15 U.S.C. § 77d(a)(6); 17 C.F.R. § 227.100, *et seq*. For the period relevant to this case, those provisions allowed an unregistered offering of up to $1,070,000 through an intermediary such as a funding portal registered under Rule 400 of Regulation CF. *See* 17 C.F.R. § 227.100(a)(1); 82 Fed. Reg. 17545 (Apr. 12, 2017). Issuers relying on Regulation CF are required to file a "Form C" and an offering statement with the SEC prior to the start of a crowdfunding offering and to disclose certain information about the issuer and the offering. 17 C.F.R. § 227.203.

Real Estate, LLC ("420") (the "420 Offering"). (Ex. 9, RFA 6, 7; Ex. 15, Shamsid-Deen Dep. 11:3-16, 10:15-20, 12:9-24.) Japhia hired a well-known journalist and social media figure to advertise investments in the TRE and 420 Offerings using scripts aimed at "everyday investors" who could get in for "as little as $200." (Ex. 1, Martin Test. 30:24-31:21, 32:18-33:25, 40:9-17, 55:7-58:22, 116:10-117:10; Ex. 37, TRE Ad Script; Ex. 38, 420 Ad Script.) In addition to the advertisements, Japhia directed communications with current and prospective investors, including instructing that certain TRE and 420 investors be given a refund, and directly corresponding with at least one TRE investor who sought a refund. (Ex. 9, RFA 17, 26; Ex. 25, 1/27/2021 Emails.)

No registration statements were filed in connection with either offering. (Ex. 10, Tushaus Decl. ¶ 37.) Both offerings purportedly relied on the exemption from registration in Regulation CF [17 C.F.R. Part 227]. (Ex. 2, TRE Offering Statement at 1; Ex. 17, TRE Form C at 2; Ex. 3, 420 Offering Statement at 1; Ex. 18, 420 Form C at 2.)

### A.    The TRE Offering and Misappropriation of Investor Funds

In August 2018, Japhia initiated the crowdfunding offering in TRE. Japhia controlled the activities of TRE. (Ex. 9, RFA 6.) Japhia asked Nicole Birch ("Birch"), a Georgia attorney with whom he was in a personal relationship at the time, to serve as CEO for TRE. (Ex. 9, RFA 8; Ex. 16, Japhia Test. 60:11-61:6.)

Japhia and Birch worked together to raise funds through the TRE Offering. (Ex. 7, Shykora Decl. ¶ 7.) Fundanna, a platform operated by a registered crowdfunding intermediary named TruCrowd, Inc., served as the crowdfunding portal for the TRE Offering. (Ex. 7, TRE Form C at 1; Ex. 19, Castillo Decl. ¶ 3 & Ex. A.) Japhia reviewed the TRE Offering Statement before it was posted on the Fundanna website. (Ex. 16, Japhia Test. 85:2-17.)

TRE filed its Offering Statement and Form C with the SEC on September 12, 2018. (Ex. 10, Tushaus Decl. ¶¶ 8, 9.) TRE offered up to 10,700 convertible notes (the "TRE Notes") for $100 each, with each subscription consisting of a "15% convertible Note . . . that mature[d] eighteen months from the date of issuance, and, at [the] company's option, [was] convertible at a 10% discount into the public market." (Ex. 2, TRE Offering Statement at 7.)

The TRE Offering Statement represented that one person—Birch—served as the company's sole officer, director, or "person occupying similar status or performing a similar function." (Ex. 2, TRE Offering Statement at 2.) In fact, Japhia controlled TRE. (Ex. 9, RFA 6.) The TRE Offering Statement and Form C omitted any mention of Japhia or his control of the company. (Ex. 2, TRE Offering Statement; Ex. 17, TRE Form C.) Japhia did not inform any investors or prospective investors in TRE that he had pled guilty to state criminal charges (Ex. 9, RFA 4), nor did he inform investors that he controlled TRE (Ex. 9, RFA 15).

5

The TRE Offering Statement represented that TRE had "contingently acquired a 9-plus acre property with 80,000 Square Foot Green Houses located in California." (Ex. 2, TRE Offering Statement at 4.) This statement was false. LAA had never owned the property. (Ex. 7, Welty Decl. ¶ 10.) LAA, of which Japhia was a partner, leased the property with an option to purchase. But LAA held the lease and the option, not Japhia or TRE. (*Id.* ¶¶ 3-7; Ex. 5, Wilson Decl. ¶ 3.) LAA never exercised its option to purchase. (Ex. 5, Wilson Decl. ¶ 4.) Eventually the purchase option expired. (Ex. 7, Welty Decl. ¶¶ 5-10.) Japhia knew in September 2018 that the "9+ acre property" referenced in the TRE Offering Statement was still held by the existing owner, had been leased to LAA, and that TRE had no ownership interest in it. (Ex. 9, RFA 19, 20, 21.) Japhia took no steps to correct the false disclosures about the property in the TRE Offering Statement. (*Id.*, RFA 22.)

In testimony, Japhia admitted that funds from the TRE Offering would be used as "seed capital" for his planned Bangi securities offering. (Ex. 16, Japhia Test. 63:17-64:3; *see also* Ex. 11, Jackson Test. 34:13-20.) At the first Bangi Board meeting, Japhia stated that TRE raised the maximum amount of money allowed for a crowdfunding offering. (Ex. 11, Jackson Test. 34:8-12.) Japhia cited the success of the TRE Offering as a reason to believe that Bangi could use the same crowdfunding strategy to raise money. (*Id.*, Jackson Test. 32:19-33:15.)

6

From September 2018 through May 2019, TRE raised $1,020,100 from approximately 1,850 investors in at least 43 states, ranging in amounts of $100 to $10,000. (Ex. 10, Tushaus Decl. ¶ 12.) The TRE Offering Statement represented that, after offering expenses, TRE intended to use the offering proceeds as follows: (1) $194,740 for marketing; (2) $97,370 for legal fees; (3) $584,220 for property improvement; and (4) $97,370 in administrative fees. (Ex. 2, TRE Offering Statement at 16.) Nevertheless, none of TRE Offering proceeds were spent on improvements to real estate. (Ex. 10, Tushaus Decl. ¶ 18.)

Japhia directed Birch to transfer funds from the TRE Offering to himself and his company Shumoja Media Group ("Shumoja"). (Ex. 9, RFA 18.) Ultimately, Japhia received $50,700, Shumoja received $320,313, and Birch's law firm received $310,360. (Tushaus Decl. ¶¶ 13, 15, 17 & Ex. B at 2.) In addition, payments totaling $84,251 benefited Bangi; an entity controlled by Japhia associate Willard Jackson ("Jackson") received $13,000; other associates of Japhia received $6,000; and attorneys for Japhia received $20,000. (Ex. 16, Japhia Test. 73:18-19; Ex. 10, Tushaus Decl. ¶¶ 14, 16, 17 & Ex. B at 2.) No TRE investors have received the promised principal or interest. (Ex. 10, Tushaus Decl. ¶ 20.)

## B.   The 420 Offering and Misappropriation of Investor Funds

In April and May of 2019, Japhia initiated another crowdfunding offering, this time involving 420. Japhia controlled the activities of 420. (Ex. 9, RFA 7.)

7

Japhia asked Jackson, a director of Bangi, to serve as CEO for 420. (*Id.*, RFA 9; Ex. 11, Jackson Test. 26:20-28:8.) Jackson knew little about crowdfunding at the time. (Ex. 11, Jackson Test. 25:24-26:4, 37:11-14.)

420 filed its Form C and Offering Statement with the SEC on May 7, 2019. (Ex. 10, Tushaus Decl. ¶¶ 10, 11.) As with the TRE Offering, the 420 Offering used the Fundanna crowdfunding platform. (Ex. 18, 420 Form C at 1.) 420 offered up to 1,070,000 convertible notes (the "420 Notes") for $100 each, with terms similar to those of the TRE Notes. (Ex. 3, 420 Offering Statement at 13.) The 420 Offering Statement represented that the company employed a senior management team with significant experience in the real estate industry and sophisticated finance and capital markets expertise. (*Id.* at 7.) The 420 Offering Statement stated: "Our senior management team has significant experience in all aspects of real estate industry, including acquisitions, dispositions, leasing, development and management and finance." (*Id.* at 3.) The truth was that Japhia controlled 420 (Ex. 9, RFA 7) and that the only members of the "senior management team" were Japhia and Japhia's company (Ex. 11, Jackson Test. 84:22-85:17). Japhia's name did not appear in the 420 Offering Statement. (Ex. 3, 420 Offering Statement.)

Japhia provided all the information for the 420 Offering Statement to the person he hired to prepare that document. (Ex. 15, Shamsid-Deen Dep. 33:3-34:18.) Japhia took no steps to correct any incorrect disclosures in the document.

8

(Ex. 9, RFA 29.) Japhia did not inform any investors that he controlled the activities of 420, nor did he inform any investors that he had pleaded guilty to state criminal charges. (*Id.*, RFA 23, RFA 5.) Japhia knew that 420 did not have any "strategic partners" as stated in the 420 Offering Statement. (*Id.*, RFA 28.)

From May 2019 through June 2020, 420 raised $888,180 by selling 420 Notes to approximately 2,000 investors in at least 44 states, ranging in amounts of $100 to $11,000. (Ex. 10, Tushaus Decl. ¶ 21 & Ex. B at 3.) Jackson understood that, after the completion of the 420 Offering, the 420 Notes would be converted to ownership interests in Bangi. (Ex. 11, Jackson Test. 98:18-20; 110:21-111:3.)

Japhia arranged for money received from the 420 investors to be transferred to an escrow account held by his attorney, Douglas Hampton ("Hampton"). (Ex. 16, Japhia Test. 121:10-122:5; Ex. 10, Tushaus Decl. ¶ 21; Ex. 20, Hampton Dep. 14:7-20, 18:5-25; Ex. 27, Escrow Agreement; Ex. 28, Irrevocable Direction Letter and Payment Order.) Hampton then disbursed the offering proceeds as directed by Japhia and Jackson. (Ex. 20, Hampton Dep. 3:24-15:13, 16:4-20:13, 23:7-20; Ex. 30, 5/6/2021 Email; Ex. 31, 10/2/2019 Email; Ex. 32, 10/18/2019 Email; Ex. 33, 2/20/2020 Email; Ex. 34, 11/21/2019 Email; Ex. 11, Jackson Test. 60:1-15, 124:15-125:25.)[4]

---

[4] After payment of offering fees, net offering proceeds of $829,078 were deposited into Hampton's escrow account. During the same period, funds were transferred

The 420 Offering Statement represented that, after offering expenses, the company intended to use the offering proceeds as follows: (1) $537,450 for marketing; (2) $97,370 for legal fees; (3) $278,960 for property acquisition; and (4) $97,370 in administrative fees. (Ex. 3, 420 Offering Statement at 12.) The 420 Offering Statement did not mention Bangi or any intent to use the offering proceeds for Bangi. (*Id.*) Relevant bank records show no payments from the proceeds of the 420 Offering to acquire property. (Ex. 10, Tushaus Decl. ¶ 28.)

The 420 Offering Statement represented that 420 was not a party to any proposed transaction in which an officer, director or promoter of 420 would receive more than 5% of the aggregate amount of capital that 420 raised in the offering. (Ex. 3, 420 Offering Statement at 16.) In fact, $298,414 of the offering proceeds was paid to Japhia, people associated with Japhia, Japhia's company Shumoja, Japhia's relatives, Japhia's lawyers, and for the benefit of Bangi; and $283,879 was paid to Jackson and companies affiliated with Jackson, including Ebony Media Holdings ("Ebony"). (Ex. 10, Tushaus Decl. ¶¶ 22-26 & Ex. C at 2; Ex. 29, 4/16/2020 Email; Ex. 9, RFA 34.)

Japhia emailed Jackson on April 16, 2020, with the subject "420 Real Estate," writing: "Willard as you are aware this platform was originally set up to

---

between the escrow account and two other accounts held by Hampton. Ultimately, a net of $69,086 was added to the 420 offering proceeds in Hampton's escrow account. (Ex. 10, Tushaus Decl. ¶ 21.)

help EBONY and BANGI accomplish its (sic) goals. Per our contractual agreement Ebony and yourself were to receive 350K dollars. That obligation has been met and more." (Ex. 29, 4/16/2020 Email; Ex. 9, RFA 34.)

Amina Shumake is Japhia's daughter. (Ex. 21, A. Shumake Dep. 15:13-16:4; Ex. 36, 8/2/2019 Email.) At Japhia's request, she performed limited work for Bangi. (Ex. 21, A. Shumake Dep. 8:24-9:4, 20:7-11.) Hampton paid $15,800 to Amina Shumake from the 420 Offering proceeds. (Ex. 10, Tushaus Decl. ¶ 32; Ex. 20, Hampton Dep. 60:9-23; Ex. 9, RFA 27.) Less than $1,000 of that money was to pay Amina for work she performed for Bangi; most of it was Japhia merely giving money to his daughter. (Ex. 21, A. Shumake Dep. 26:14-27:8.)

Diop Shumake is Japhia's son. (Ex. 14, D. Shumake Dep. 7:16-17.) At Japhia's request, Diop Shumake also performed limited work for Bangi and for 420. (*Id.* 12:2-10; Ex. 35, 2/3/2020 Email.) Hampton paid Diop $17,680 from the escrow account containing the 420 Offering proceeds. (Ex. 10, Tushaus Decl. ¶ 33; Ex. 20, Hampton Dep. 59:10-60:2; Ex. 9, RFA 27.) Approximately $500 of that money was to pay Diop for the work he performed for Bangi and 420; most of it was Japhia giving money to his son. (Ex. 14, D. Shumake Dep. 57:6-58:24.)

Natalie King is Japhia's wife. (Ex. 22, King Dep. 5:20-21.) King never performed any work for 420. (*Id.* 12:4-5.) Hampton paid King $45,000 from the escrow account containing the 420 Offering proceeds. (Ex. 10, Tushaus Decl. ¶ 34;

11

Ex. 9, RFA 27.) Payments totaling $35,000 were loans Japhia made to King, which

King claims to have repaid by making payments to Japhia rather than to 420. (Ex.

22, King Dep. 37:17-39:12, 39:21-40:6.)

Darren Coleman is the godfather of Japhia's daughter, Amina. (Ex. 21, A.

Shumake Dep. 10:21-22.) Coleman was paid a total of $27,800 from the proceeds

of the TRE and 420 Offerings. (Ex. 10, Tushaus Decl. ¶ 35.) Hampton paid $5,000

to a Japhia associate, Joshua Griggs ("Griggs"), from the escrow account

containing the 420 Offering proceeds. (Ex. 10, Tushaus Decl. ¶ 31; Ex. 9, RFA 27;

Ex. 6, Griggs Dep. 52:7-25; 53:1-18.) That payment partially repaid a loan Griggs

had made to Japhia which was unrelated to 420. (Ex. 6, Griggs Dep. 52:20-53:10.)

No investors in the 420 Offering received the return of principal or interest

described in the 420 Offering Statement. (Ex. 10, Tushaus Decl. ¶ 30.)

## III.   JAPHIA ASSERTED HIS FIFTH AMENDMENT PRIVILEGES

When Japhia was deposed in this matter, he asserted his Fifth Amendment

privilege against self-incrimination to all questions, including questions about the

following facts. (Ex. 23, Japhia Dep.)

   a.   His role in the TRE and 420 Offerings. (*Id.* 5:25-6:2, 7:4-7.)
   b.   The amount of money he received from the funds raised through the
        TRE and 420 Offerings. (*Id.* 6:20-23, 7:19-22.)
   c.   His connection with numerous persons and businesses who received
        money from the proceeds of the TRE Offering and why he directed
        Birch to transfer money from the TRE Offering proceeds to those
        persons and businesses. (*Id.* 10:1-16:8.)

    d.    His connection with numerous persons and businesses who received money from the proceeds of the 420 Offering and why he directed Hampton to transfer money from the 420 Offering proceeds to those persons and businesses. (*Id.* 12:14-22:4.)

    e.    Whether he controlled Bangi, Inc. (*Id.* 8:13-18.)

    f.    The relationship between Bangi and TRE. (*Id.* 8:19-21.)

    g.    The relationship between Bangi and 420. (*Id.* 8:22-24.)

    h.    The other Bangi entities and his role with those entities. (*Id.* 8:25-9:5.)

    i.    A description of Shumoja. (*Id.* 9:6-7.)

    j.    His control of Shumoja. (*Id.* 9:8-13.)

    k.    Shumoja affiliates and his role with those entities. (*Id.* 9:14-19.)

## ARGUMENT

## I.  SUMMARY JUDGMENT STANDARD

A district court "shall grant summary judgment" if the movant demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is "genuine" only if the evidence could support a jury verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once the movant establishes that there is no genuine issue of material fact, the opposing party must come forward with "specific facts" showing that there is a need for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

In a civil case, courts draw an adverse inference against a defendant who refuses to answer questions and invokes the Fifth Amendment. *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *SEC v. Onyx Capital Advisors, LLC*, No.

10-11633, 2012 WL 4849890, *3 (E.D. Mich. Oct. 11, 2012). "Silence is often evidence of the most persuasive character." *United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153-54 (1923). Courts often grant summary judgment to the SEC where, as here, a defendant invokes the Fifth Amendment. *See, e.g., SEC v. Zada*, No. 10-CV-14498, 2013 WL 3945993 at *4 (E.D. Mich. July 31, 2013), *aff'd*, 787 F.3d 375 (6th Cir. 2015); *SEC v. Bongiorno*, No. 1:20-cv-00469, 2023 WL 2865625 at *2 (N.D. Ohio Apr. 10, 2023); *SEC v. Monterosso*, 768 F. Supp. 2d 1244, 1268 (S.D. Fla. 2011), *aff'd*, 756 F.3d 1326 n.19 (11th Cir. 2014) ("we note the evidence of scienter is reinforced by the adverse inference from [defendant's] invocation of the Fifth Amendment privilege at his deposition"); *SEC v. Lyttle*, 538 F.3d 601 (7th Cir. 2008); *SEC v. Art Intellect, Inc.*, No. 2:11-CV-357, 2013 WL 840048, *19 (D. Utah Mar. 6, 2013); *SEC v. Suman*, 684 F. Supp. 2d 378, 386 (S.D.N.Y. 2010); *SEC v. Asset Recovery and Mgmt. Trust, S.A.*, No. 2:02-CV-1372-WKW, 2008 WL 4831738, at *8 (M.D. Ala. Nov. 3, 2008); *SEC v. Global Telecom Servs. LLC*, 325 F. Supp. 2d 94, 109 (D. Conn. 2004).

## II.   JAPHIA VIOLATED THE FEDERAL SECURITIES LAWS

### A.   The TRE and 420 Notes Were Securities.

The TRE and 420 Notes are "securities" because they are "investment contracts." *See SEC v. Prof'l Assocs.*, 731 F.2d 349, 352-53 (6th Cir. 1984). An "investment contract" means: "(1) an investment of money (2) in a common

14

enterprise (3) with a reasonable expectation of profits to be derived solely from the efforts of others." *Id.* (citing *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946)). This broad definition "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299. The TRE and 420 Notes easily satisfy this test. Investors provided nearly $2 million to TRE and 420 with the expectation their profits would derive from those companies purchasing and improving real estate involved in the production of cannabis. TRE and 420 both boasted about the purported skills and experience of their management teams. (Ex. 2, TRE Offering Statement at 3; Ex. 3, 420 Offering Statement at 3.) It was management's—not the investors'—job to run the business. The investments were entirely passive.

The TRE and 420 Notes are likewise "securities" because they are "notes." *See*, *e.g.*, *Zada*, 787 F.3d at 380-81 (citing *Reves v. Ernst & Young*, 494 U.S. 56, 61-65 (1990)). Under the securities laws, "there is a presumption that a particular note is a security." *Id.* 380 (citing *Reves*, 494 U.S. at 65). Indeed, a note is a security where, as here: (1) "the buyers' purpose was 'investment'"; (2) the "notes are sold to a wide range of unsophisticated people, as opposed to a handful of institutional investors"; (3) "a reasonable person would expect the securities laws to apply to them"; and (4) no "risk-reducing factor makes application of the

15

Securities Acts unnecessary." *Id.* 380-81 (citing *Reves* 494 U.S. at 66-67).

All four factors are met here. Since the Notes were sold as part of a crowdfunding offering, the buyers' purpose was investment. The Notes were sold to a wide range of small-dollar investors. Given Regulation CF, a reasonable person would expect the securities laws to apply to crowdfunding offerings. Finally, there are no risk-reducing factors that would make the application of the securities laws unnecessary. Therefore, Japhia cannot rebut the presumption that the Notes are securities. Thus, the investments sold by Japhia were securities.[5]

### B.    Japhia Directed a Scheme to Conceal His Involvement with the TRE and 420 Offerings and Misappropriate the Proceeds (Counts I and II).

Japhia knowingly, or recklessly, participated in a scheme to defraud. The essence of his scheme was to conceal his own involvement in the TRE and 420 Offerings and misappropriate the investors' money. Japhia engaged in numerous overt acts perpetrating and in furtherance of the scheme, including establishing TRE and 420, organizing their management, structuring the offerings, reviewing the offering materials, coordinating advertisements, and directing the flow of funds to himself, his family, and his associates.

---

[5] Both offerings, which reaped investments from investors in dozens of states, used interstate commerce. (Ex. 10, Tushaus Decl. ¶¶ 12, 21.)

Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) prohibit any person from employing "any device, scheme, or artifice to defraud" or engaging in any "act, practice, or course of business" which operates as a fraud or deceit in connection with the purchase or sale of a security. Sections 17(a)(1) and (a)(3) of the Securities Act prohibit the same misconduct in the offer or sale of securities. "These provisions capture a wide range of conduct." *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019).[6] Proof of scienter is required to establish violations of Rules 10b-5(a) and (c) and Section 17(a)(1); negligence is sufficient for Section 17(a)(3). *Aaron v. SEC*, 446 U.S. 680, 691, 697 (1980). Scienter includes intentional misconduct as well as recklessness. *See SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985). Knowingly disseminating a false statement to investors with the intent to deceive constitutes a "scheme" under Rule 10b-5(a). *Lorenzo*, 139 S. Ct. at 1100-110. "Those who disseminate false statements with intent to defraud are primarily liable under Rules 10b–5(a) and (c), § 10(b), and § 17(a)(1)." *Id.* 1104.

As described above, although Japhia actually controlled TRE and 420, Japhia designated figureheads—his associate Birch for TRE, Jackson for 420, and a non-existent "senior management team" for TRE and 420—as front people for the Offerings. Japhia's purpose was obscuring his involvement in the Offerings

---

[6] The Sixth Circuit has not defined the elements required for claims under Exchange Act Rules 10b-5(a) and (c). *See Teamsters Local 237 Welfare Fund v. ServiceMaster Global Holdings, Inc.*, 83 F.4th 514, 525 (6th Cir. 2023).

and his criminal history. Japhia then directed his associates to market the TRE and 420 Offerings as vehicles to raise money to acquire and improve real estate for the cannabis industry, when in fact Japhia had devised the offerings simply as vehicles to misappropriate investor funds. At Japhia's direction, hundreds of thousands of dollars of investor money was paid to Japhia; his family, business associates, and lawyers; his company, Shumoja; and to Bangi, which he controlled.

By orchestrating the TRE and 420 Offerings to conceal Japhia's involvement and his criminal past, and by misappropriating the TRE and 420 offering proceeds, Japhia, knowingly or recklessly, engaged in devices, artifices, and schemes to defraud and in acts, practices, and courses of business that acted as a fraud and deceit. As a result, he violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c), and Securities Act Sections 17(a)(1) and (3). (Counts I and II.) *See SEC v. Zandford*, 535 U.S. 813, 821-22 (2002) (stockbroker's sale of client securities and subsequent misappropriation constituted a fraudulent scheme in violation of Rule 10b-5); *see also SEC v. Bongiorno*, No. 1:20-cv-00469, 2021 WL 5866991, at *5 (N.D. Ohio Dec. 10, 2021) (SEC sufficiently alleged fraudulent scheme to conceal identity and misappropriate investor funds by sending them to an entity the defendant controlled); *SEC v. Battenberg*, No. 06-14891, 2010 WL 1416981, at *2-4 (E.D. Mich. Apr. 8, 2010) (denying defendant's motion for summary judgment where defendant "participated in a scheme which had the

purpose and effect of misrepresenting" corporate financial statements even though defendant did not directly make false statements to the investing public).

Japhia acted knowingly or recklessly. When Japhia was deposed, he asserted his privilege against self-incrimination rather than answer questions about the payment of offering proceeds to his family, lawyers, and business associates. Japhia's refusal to testify creates an adverse inference as to Japhia's culpable state of mind. *See, e.g., Zada*, 2013 WL 3945993, at *4 (summary judgment for SEC on scienter-based fraud claims). On top of this adverse inference, substantial evidence inescapably points to Japhia's knowing or reckless state of mind, including the facts that Japhia: (1) controlled both TRE and 420; (2) directed how payments would be made from offering proceeds; (3) reviewed the offering statements for both the TRE and 420 Offerings and knew what they falsely promised investors about the use of the offering proceeds; and (4) directed payments that diverted most of the offering proceeds away from those promised business expenditures. Japhia even admitted in an email to Jackson that the planned purpose of the 420 Offering was to raise $350,000 for Ebony and Bangi.

By engaging in a fraudulent scheme, with scienter, Japhia violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c), and Securities Act Section 17(a)(1). And by doing so negligently, he violated Securities Act Section 17(a)(3).

### C.    Japhia Negligently Received Money by Means of False and Misleading Statements of Material Fact (Count I).

Japhia violated Securities Act Section 17(a)(2), which makes it illegal to obtain money by means of false and misleading statements of material facts. Negligence suffices to establish a violation. *Aaron*, 446 U.S. at 697.

To begin, Japhia received money—hundreds of thousands of dollars paid to him and to Shumoja—from the two offerings. And while he did not write the offering statements, he did review them and therefore knew they contained false and misleading statements about him and the use of the offering proceeds. He controlled TRE and 420. He recruited Birch and Jackson to serve as the CEOs of the two issuers. He directed how the offering proceeds were disbursed. He, Birch, and Jackson took most of the offering proceeds. He had a criminal record. These were all material facts. None of them was disclosed. Instead, the offering statements gave false and misleading descriptions of the issuers' management and the planned use of the offering proceeds, with no mention of Japhia or his role.

Japhia took no steps to correct the offering statements, or to disclose to investors, the truth about his background and his role in TRE and 420. But he did receive money by means of the offering statements and his interactions with investors. Japhia's conduct was at least negligent. By this conduct, Japhia violated Securities Act Section 17(a)(2).

### D.    Japhia Violated Securities Act Section 5 (Counts III and IV).

Sections 5(a) and 5(c) of the Securities Act prohibit the offer and sale of securities through unregistered transactions. To establish a *prima facie* violation, the SEC must prove that: (1) no registration statement was in effect or had been filed as to an offering; (2) the defendant, directly or indirectly, sold or offered to sell the securities; and (3) the offer or sale was made through use of the interstate facilities or the mails. *SEC v. Bravata*, 3 F. Supp. 3d 638, 659 (E.D. Mich. 2014) (summary judgment for SEC). Scienter is not required for this strict liability offense. *Id*. Once a prima facie case has been made, the burden shifts to the defendant to show that a registration exemption was available. *Id.*

No registration statements were filed or in effect for the TRE or 420 Offerings. The issuers purported to rely on the crowdfunding registration exemption under Regulation CF. However, the offerings did not qualify for that, or any other, exemption from registration. To qualify for the crowdfunding exemption, an issuer must comply with the requirements in Section 4A(b) of the Securities Act [15 U.S.C. § 77d-1(b)] and the related requirements in Regulation CF Rule 201 [17 C.F.R. § 227.201]. Rule 201 requires issuers to disclose, *inter alia*: (1) the names of the directors and officers of the issuer (and any persons occupying a similar status or performing a similar function); (2) the "purpose and intended use of the offering proceeds;" (3) related-party transactions with the

21

issuer's officers and promoters that are, in the aggregate, in excess of five percent of the aggregate capital that the issuer seeks to raise; and (4) "any material information necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."

The TRE and 420 Offerings failed to meet these disclosure requirements. The offering statements and Forms C for both offerings concealed Japhia's name, his control of the issuers, his background, and the true intended use of investor funds. Those documents also concealed the truth about the intended related-party transactions—that far more than 5% of the aggregate capital raised in each offering was to be paid to, or for the benefit of, Birch and Jackson (the issuers' CEOs) and Japhia (who controlled and promoted both issuers and both offerings).[7]

Japhia, by virtue of controlling both TRE and 420, actively participated in both the TRE and the 420 Offerings. He reviewed both offering statements but did

---

[7] The TRE and 420 Offerings also failed to qualify for any other exemption. Because they sold securities to investors in different states, the intrastate exemption of Securities Act Section 3(a)(11) [15 U.S.C. § 77c(a)(11), Rule 147 [17 C.F.R. § 230.147], and Rule 147A [17 C.F.R. § 230.147A] are inapplicable. The offerings employed general solicitation and did not meet conditions required to take advantage of the private offering exemption of Securities Act Section 4(a)(2) [15 U.S.C. § 77d(a)(2)], the Rule 504 exemption of Regulation D [17 C.F.R. § 230.504], or the safe harbor of Rule 506(b) [17 C.F.R. § 230.506(b)]. Rule 506(c) [17 C.F.R. § 230.506(c)] is not available because securities were sold to non-accredited investors. Finally, the offerings were made by the issuers and therefore do not qualify for the exemption under Section 4(a)(1) of the Securities Act [15 U.S.C. § 77d(a)(1)].

not correct their false statements. He allowed the offering statements and Forms C to be filed with the SEC. He also promoted the offerings by arranging for them to be advertised on social media. By this conduct, Japhia violated Sections 5(a) and 5(c) of the Securities Act.

### E. Japhia Aided and Abetted the Other Defendants' Violations (Counts V, VI, and VII).

Under Securities Act Section 15(b) and Exchange Act Section 20(e), "any person that knowingly or recklessly provides substantial assistance to another person in violation" of a provision of, respectively, the Securities Act or the Exchange Act "shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided." 15 U.S.C. § 77o(b); 15 U.S.C. § 78t(e). Aiding and abetting requires a showing that: (1) another party committed a securities law violation; (2) the defendant had a general awareness that his role was part of an overall activity that was improper; and (3) the defendant knowingly and substantially assisted in the violation. *See SEC v. Coffey*, 493 F.2d 1304, 1316 (6th Cir. 1974).

With respect to the second and third elements, the SEC must show Japhia knew that: (1) "his role was part of an overall activity that was improper, or acted with reckless disregard for the truth" and (2) "he was rendering assistance, or acted with reckless disregard for the truth." *SEC v. Battenberg*, No. 06-14891, 2011WL 3472619, *5-6 (E.D. Mich. Aug. 9, 2011). "Substantial assistance" means that the

23

defendant "in some sort associate[d] himself with the venture, that he participate[d] in it as in something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed." *United States v. Searan*, 259 F.3d 434, 444 (6th Cir. 2001) (citations omitted).

Japhia aided and abetted Birch's and Jackson's violations of Sections 5(a), 5(c) and 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, as described above. First, Birch and Jackson, as CEOs of the two issuers, conducted the unregistered securities offerings. They were fronts for Japhia; but they, nonetheless, conducted the offerings through the Fundanna website, drafted the false and misleading offering statements and Forms C, and filed those documents with the SEC. They also worked with Japhia to fraudulently divert the offering proceeds away from the purposes represented to investors and instead used the money to benefit themselves and Japhia. Second, Japhia provided substantial assistance. He controlled both TRE and 420. He directed the way the offering proceeds were fraudulently diverted. He arranged for the offerings to be advertised. Finally, Japhia acted knowingly. He knew the offering statements concealed his role with the issuers. And he acted deliberately when he diverted investor funds to himself and for other undisclosed and improper purposes.

It follows that Japhia is liable for aiding and abetting the fraud and unregistered sales of the other defendants.

24

## **CONCLUSION**

For the foregoing reasons, Plaintiff SEC respectfully asks that the Court

grant summary judgment on liability against Defendant Japhia.

Dated:  July 28, 2025               Respectfully submitted,

**UNITED STATES SECURITIES**
**AND EXCHANGE COMMISSION**

*s/BeLinda I. Mathie*
BeLinda I. Mathie, Illinois Bar No. 6275461
Benjamin Hanauer, Illinois Bar No. 6280156
Jerrold H. Kohn, Illinois Bar No. 6188085
U.S. Securities and Exchange Commission
Chicago Regional Office
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
(312) 353-7390
(312) 353-7398 (facsimile)
MathieB@sec.gov
HanauerB@sec.gov
KohnJ@sec.gov

Julie A. Beck, Acting United States Attorney
Kevin Erskine (P69120), Assistant United States
Attorney
211 W. Fort Street, Ste. 2001
Detroit, MI 48226
Tel: (313) 226-9610
Email: Kevin.Erskine@usdoj.gov

*Attorneys for Plaintiff*